Kevin HOWARD, Plaintiff,

v.

JACOBS ENGINEERING, INC., Defendant.

No. H–7–cv–01359.

United States District Court, S.D. Texas, Houston Division.

Nov. 12, 2008.

Jermaine Savoy Thomas, Barnes and Turner, Houston, TX, for Plaintiff.

Marjorie A. Murphy, Timothy Mitchell Watson, Seyfarth Shaw LLP, Houston, TX, for Defendant.

### *ORDER*

KEITH P. ELLISON, District Judge.

Pending before the Court is the Defendant Jacobs Engineering Group, Inc.'s Motion for Summary Judgment. (Doc. No. 12.) For the following reasons, Defendant's Motion should be granted in part and denied in part.

## I. BACKGROUND

### A. Factual History

Plaintiff Kevin Howard is an African–American male. He alleges that he was discriminated against based on race and sex in violation of Title VII of the Civil Rights Act of 1964 and § 1981 when he was denied advancement in the company and eventually terminated, without cause, in March 2006.

Plaintiff attended college for several years in the early 1990s, and afterwards worked at companies and law firms in various roles providing office services such as copying and filing. In late 2002, Plaintiff began working at Defendant Jacobs Engineering Group, Inc. ("Jacobs") as a contract employee through an employment agency. Plaintiff was hired directly on or about January 27, 2003, in Jacobs' Facilities Department, under Richard Connelly, to perform tasks such as filling copiers and performing office moves. (Pl. Dep., Doc. No. 12, Ex. B, 36–37.) After about one year at the company, Plaintiff was promoted to the front desk in the Reprographics Department, under Sean Boyles. (Pl. Dep., Doc. No. 12, Ex. B, 45–47; 51.) In

the summer of 2004, Manager Jim Guidry promoted Plaintiff to the Document Control Department ("DCD"), and he was assigned to the Premcor Project. Over this time period, Plaintiff's hourly salary rose from approximately $10/hr to $13/hr.

On or about August 7, 2004, Plaintiff took the position "Document Control I" in the DCD. (Doc. No. 12, Ex. A, ¶ 4.) All DCD employees are required to learn and operate "Engineering JPI" or "JPI Vendocs," two software programs. Jacobs claims that knowledge of JPI is a critical skill in the DCD. (Doc. No. 12, Ex. A, ¶ 3.) Plaintiff was assigned to distribute mail and other materials for the Premcor project until he learned JPI. (Doc. No. 12, Ex. A, ¶ 5.) On or about June 2005, Cristina Dunn, a white female, took over as DCD Manager. (Pl. Compl. ¶ 6.) Before Guidry left, he arranged for Jennifer Phillips, a white female, to train Plaintiff to operate Engineering JPI.

As is typical at Jacobs, after the Premcor Project was terminated, the employees on the Project were "destaffed:" employees were laid off pending reassignment to other jobs. (Doc. No. 12, Ex. A, ¶ 2.) Six employees, including Plaintiff, were originally scheduled to be destaffed throughout September, October, and November 2005. This destaffing was delayed, and, in December, Plaintiff approached Dunn to ask what he needed to do to ensure his assignment to a new project. (Pl. Dep., Doc. No. 12, Ex. B, 77; Dunn Dep., Doc. No. 24, Ex. C, 90.) Dunn allegedly told him that he needed to possess a minimum skill set to perform as a DCD employee and extended his destaffing date to February 2006 to allow him to receive training. (Doc. No. 12, Ex. A, ¶ 12.) Dunn explained that Plaintiff's options, given that he was having difficulties meeting the minimum skill set in the DCD, were to return to Reprographics, seek work in another department, or "he would have to not work at

Jacobs." (Dunn Dep., Doc. No. 24, Ex. C, 90.)

Dunn then arranged for Plaintiff to receive six weeks of individualized JPI training and basic computer skills from Courtney Fletcher, Linda Giles, and Gina Arias in the DCD. (Doc. No. 12, Ex. A, ¶ 13.) While the progress reports from this training were mixed, Fletcher reported some improvement, and asked that Plaintiff's assignment be extended, a request Dunn approved. (Doc. No. 12, Ex. A, ¶ 16.) Plaintiff claims that, during this training period, he had no interest in remaining in the DCD under Dunn because he expected to be staffed in the Piping Department. (Pl. Dep., Doc. No. 12, Ex. B, 124; 126–27.)

In March 2006, Dunn allegedly recommended that Plaintiff's employment be terminated. Human Resources Director John Kadash approved the recommendation and Plaintiff was terminated on March 31, 2006. Dunn did not hire another "Document Control I" employee, until October 2006. This new employee, an African–American male, was not assigned mail-distribution duties. (Doc. No. 12, Ex. A, ¶ 24.)

### B. Procedural History

Plaintiff filed a formal complaint with the EEOC, and the EEOC issued a right to sue letter. Plaintiff then filed this lawsuit, alleging that Defendant unlawfully terminated him in violation of Title VII and Section 1981 of the Civil Rights Act because of his race and sex. Plaintiff seeks attorney's fees, back pay, costs, front pay, and compensation for emotional pain, and past and future mental anguish. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment under Federal Rule of Civil Procedure 56 re-

quires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED.R.CIV.P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir.2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("The existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir.2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Crawford*, 234 F.3d at 902. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505).

## III. RACE DISCRIMINATION

### A. Title VII and Section 1981 Standard

"Title VII prohibits employers from discriminating against employees on the basis of race, color, religion, sex, or national origin." *Grimes v. Texas Dep't of Mental Health*, 102 F.3d 137, 140 (5th Cir.1996). Title VII claims are subject to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The elements of Section 1981 claims, 42 U.S.C. § 1981, and Title VII, 42 U.S.C. § 2000e–2(m), are identical, and will be analyzed together.[1] *See Anderson v. Douglas & Lomason Co., Inc.*, 26 F.3d 1277, 1284 n. 7 (5th Cir.1994); *Wheeler v. BL Development Corp.*, 415 F.3d 399, 405 (5th Cir.2005) (applying the McDonnell Douglas framework to Section 1981 claims).

The plaintiff must establish a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. The facts in this case resemble a reduction in force because after the Premcor Project was destaffed, employees were reassigned to new roles under different projects throughout the company. In addition, as is often the case in a reduction in force, Plaintiff's position was eliminated, a fact that Defendant concedes. (Doc. No. 12, at 19.) To put forward a prima facie case of race discrimination when termination accompanies a reduction in force, a plaintiff must provide evidence that: "(1) [he or she] is within the protected [group]; (2) he or she is adversely affected by the employer's decision; (3) he or she was qualified to assume another position at the time of the discharge or demotion; and (4) ... [is] either circumstantial or direct, from which a fact finder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue," or "that

---

1. Unlike Title VII, Section 1981 claims may only be supported by evidence of intentional discrimination rather than solely based on disparate impact. *See General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982).

after [the] discharge others who were not members of the protected class remained in similar positions." *See Faruki v. Parsons S.I.P., Inc.* 123 F.3d 315, 318 (5th Cir.1997);[2] *Chavarria v. Despachos Del Notre, Inc.*, 390 F.Supp.2d 591, 596–597 (S.D.Tex.2005); *Ortiz v. Shaw Group, Inc.*, 250 Fed.Appx. 603, 606 (5th Cir.2007); *Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 252 (5th Cir.1996); *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir.1996); *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 654 (5th Cir.1996).

If a plaintiff makes this prima facie showing, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. "The defendant's burden during this second step is satisfied by producing evidence, which, 'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'" *Price v. Federal Exp. Corp.*, 283 F.3d 715, 720 (5th Cir.2002) (citing (*St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)

(citing *St. Mary's Honor Center*, 509 U.S. at 509, 113 S.Ct. 2742)).

If the defendant meets its burden of production, "the McDonnell Douglas framework—with its presumptions and burdens" disappears, and "the sole remaining issue" is "'discrimination vel non.'" *Reeves*, 530 U.S. at 142–43, 120 S.Ct. 2097 (citing (*St. Mary's Honor Center*, 509 U.S. at 510, 113 S.Ct. 2742)). The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097 (citing *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089). To satisfy that burden, the plaintiff "may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'"[3] *Id.* (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089). "A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir.2003) (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir.2001)); *see also Gee v. Principi*, 289 F.3d 342, 347–48 (5th Cir.2002) (finding that an employer's inconsistent explanations for its employment decisions at

---

**2.** The law offered by Defendant and Plaintiff to establish a prima facie case is commonly used for claim of a disparate treatment in the case of discipline. *See, e.g., Smith v. Wal-Mart Stores (No. 471)*, 891 F.2d 1177, 1180 (5th Cir.1990). Defendant has suggested, however, that Plaintiff was terminated because there were no "floater" positions open at the end of March, Plaintiff did not want to return to the Reprographics Department, and he was not qualified to fill any remaining positions in the DCD, not because he was disciplined for improper behavior. (Dunn. Dep., Doc. No. 24, Ex. C, 120–21.) *See* discussion, *infra* Section IV.B.3.

**3.** The plaintiff may also show that the defendant's articulated reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic ("mixed motive alternative"). *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir.2004). If a plaintiff shows that discrimination was a motivating factor in a mixed-motives case, defendant must then respond with evidence that the same employment decision would have been made regardless of discriminatory motivation. *Rachid*, 376 F.3d at 312 n. 8 (citing 42 U.S.C. § 2000e–2(m)).

different times may permit a jury to infer that the proffered reasons are pretextual).

■■■ Importantly, "although the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual." *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097 (citing *St. Mary's Honor Center*, 509 U.S. at 510, 113 S.Ct. 2742; *Burdine*, 450 U.S. at 255, n. 10, 101 S.Ct. 1089). On the other hand, even if the plaintiff presents some evidence that the defendant's legitimate non-discriminatory reason is false or a pretext, "such a showing will not always be enough to prevent summary judgment, because there will be cases where a plaintiff has both established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, yet 'no rational factfinder could conclude that the action was discriminatory.'" *See Price v. Federal Exp. Corp.*, 283 F.3d 715, 720 (5th Cir. 2002) (citing *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097). As the Supreme Court has explained, "[i]t is not enough ... to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *St. Mary's Honor Center*, 509 U.S at 511, 113 S.Ct. 2742. In a case where Plaintiff shows a Defendant's legitimate, non-discriminatory reason is false, "[w]hether summary judgment is appropriate depends on numerous factors, including 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered.'" *Price*, 283 F.3d at 720 (citing *Reeves*, 530 U.S. at 148–49, 120 S.Ct. 2097.); *see also Vadie v. Miss. State*

*Univ.*, 218 F.3d 365, 374 n. 23 (5th Cir. 2000) (stating that a plaintiff can avoid summary judgment when the "evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer and (2) creates a reasonable inference that [race] was a determinative factor in the actions of which the plaintiff complains").

## B. Analysis

### 1. Prima Facie Case

■■■ Defendant argues that Plaintiff cannot establish a prima facie case because he has no evidence that Jacobs replaced Plaintiff with someone outside his protected class or that Plaintiff was treated less favorably than others outside his protected group. Plaintiff responds that he was not the only low-performing employee in the department, but he was the only one fired.

Plaintiff satisfies elements one and three: he is a member of a protected group, and he was terminated. In addition, Plaintiff presented evidence to suggest he was qualified for another position at Jacobs. He was qualified, for example, to work in the Reprographics Department where he worked prior to the DCD, or to serve as a "floater." In addition, although Dunn believed that the Piping Department employees had a "higher degree of computer interface" than those in the DCD, it was possible that he could have met the skills expectations another department, such as Piping. (Dunn Dep., Doc. No. 24, Ex. C, 138–39.) Plaintiff had performed other roles and was twice promoted. This evidence therefore allows Plaintiff to establish that he was qualified to be transferred to another position.

Finally, Plaintiff provides several examples of "problem" non-African-American

employees who were transferred rather than terminated and examples of African–Americans who were not adequately trained upon their arrival to the DCD.[4] Thus Plaintiff has met his burden of establishing a prima facie case of race discrimination.

## 2. Legitimate, Non–Discriminatory Reason

Defendant argues that even if Plaintiff is able to establish a prima facie case, Defendant has a legitimate, non-discriminatory reason for terminating Plaintiff: his failure to learn the JPI software, allegedly "required in every discipline within the company." Plaintiff contends that, even if he failed to learn the software, and was a problem employee, Jacobs still did not have grounds for terminating, rather than transferring, him.

### 3. Pre-text

#### a. Inconsistent reasons

■ Defendant has admitted that JPI skills are not needed for all departments at Jacobs, such as the Reprographics Department.[5] (Dunn. Dep., Doc. No. 24, Ex. C, 82.) Testifying via deposition, Dunn explained that Plaintiff was terminated because on the day he was let go: (1) there was no other job available for his skill set in DCD because the Premcor project was nearly complete; (2) there were no other positions for which he was qualified in other departments; and (3) the Piping Department did not appear to have any open positions at the time he was terminated. (Dunn Dep., Doc. No. 24, Ex. C, 223, 236.) Later in her deposition, Dunn admitted that it is not clear whether a position existed in Piping at the time of Plaintiff's termination, although there may have been

4. Defendant argues that Plaintiff has failed to make out a prima facie case because he has pointed to no individuals outside of his protected class who were treated differently under circumstances nearly identical to his. This is not a necessary component of a prima facie case in a reduction in force case. *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576 (5th Cir.2003) (reversing a district court holding that plaintiff had to demonstrate that preferential treatment was given to younger employee in nearly identical circumstances in order to establish either a prima facie case or to prove age discrimination generally). Previously, the Fifth Circuit noted a split within the circuit as to when this inquiry is appropriate. *See Nieto v. L & H Packing Co.*, 108 F.3d 621, 623 n. 5 (5th Cir.1997) (noting the split in a wrongful termination case). *Compare Little v. Republic Refining Co., Ltd.*, 924 F.2d 93, 97 (5th Cir.1991) (addressing disparate treatment in analyzing pretext in a wrongful termination case); *McDonnell Douglas*, 411 U.S. 792, 802, 804, 93 S.Ct. 1817 (1973) *with Johnson v. Chapel Hill Indep. Sch. Dist.*, 853 F.2d 375, 381 (5th Cir.1988) (addressing disparate treatment at the prima facie stage in a wrongful termination case); *Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir.1980). As the Title VII law has continued

to develop, however, the appropriateness of this analysis has come to depend on the particular employment practice at issue. For example, as discussed above, this analysis is important in a prima facie case for a disparate treatment in discipline. *See supra*, Section IV.A n. 2. In failure to promote cases, the similarly situated analysis comes at the pretext stage. *See Sinclair v. Potter*, No. H–04–4090, 2006 WL 763629, *6 n. 7 (S.D.Tex. Mar. 23, 2006). As noted above, there appears to be a split in the wrongful termination context although as pretext approach aligns with the Supreme Court's analysis in *McDonnell Douglas* the Court will assume without deciding that this is the appropriate approach even in the termination case. However, in the reduction in force case, the Fifth Circuit has consistently held that circumstantial evidence, not limited to evidence of disparate treatment of similarly situated employees, may establish the prima facie case. *See Ortiz v. Shaw Group, Inc.*, 250 Fed.Appx. 603, 606 (5th Cir.2007) (analyzing similarly situated employees as part of the circumstantial evidence).

5. Dunn claims that Plaintiff declined to return to the Reprographics Department. (Dunn Dep., Doc. No. 24, Ex. C, 121, 226.)

a position that was filled by someone else. (Dunn. Dep., Doc. No. 24, Ex. C, 145–46.)

■ These inconsistencies create an issue of material fact over the true reason for which Plaintiff was terminated. An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action. *See Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir.2002); *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir.2003) (holding that a jury could find employer's proffered reason for termination pretext when plaintiff presented evidence that she had not violated company policy or was authorized to deviate from stated policy and employer never discussed alleged violations with her). Where an employer offers different explanations for its decision to terminate employee, and the reason is not worthy of credence, these factors provide evidence of pretext. *See, e.g., Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 412–15 (5th Cir.2007) (upholding a finding of a material fact issue of pretext where employer first explained that it did not hire an employer because of his "purchasing experience," and later clarified in litigation that he lacked "purchasing experience in the bottling industry"). Because Defendant argued in its Motion for Summary Judgment that the legitimate reason was Plaintiff's lack of JPI skills, but Dunn admitted that the real reason involved a combination of his lack of JPI skills, his alleged refusal to return to Reprographics, and a purported lack of available positions in other departments at Jacobs, there is an issue of material fact over the real reason that Plaintiff was terminated.

In addition, Plaintiff claims he actively sought a transfer to the Piping Department and his plans were thwarted by Dunn and/or Fletcher who were building a case against him.[6] Near the end of his tenure at Jacobs, Plaintiff signed up for AutoCAD training, a software program used in the Piping Department, to prepare himself for the position. In either late 2005 or early March 2006, Dunn approved a "continuing education" form for him to take an AutoCAD course that started in April 2006, because she understood that Plaintiff wanted to transfer to the Piping Department. (Dunn. Dep., Doc. No. 24, Ex. C, 90–91, 134.) Dunn claims that she did not take issue with Plaintiff moving to the Piping Department, but was concerned that he did not have the minimum computer skills necessary to perform in a department like Piping that required more computer functions than the DCD. (Dunn Dep., Doc. No. 24, Ex. C, 142.) Similarly, Giles explained that Dunn did not want to transfer Plaintiff because Dunn did not want to transfer a "problem" to another department. (Giles Dep., Doc. No. 24, Ex. D, 77, 89; Dunn Dep., Doc. No. 24, Ex. C, 89.) On the Monday of the week Plaintiff was terminated, Dunn explained that Piping retained the opportunity to transfer Plaintiff if it wanted him, and, at Kadash's direction, Dunn e-mailed Kirk Knorr, an employee from Piping, to tell Knorr when Plaintiff was going to be destaffed. (Dunn Dep., Doc. No. 24, Ex. C, 236, 227–228.)

Plaintiff asserts that he was accepted in the Piping training by several Piping employees, including Kevin Polanski, Knorr, and Dennis Crabtree. (Pl. Dep., Doc. No. 12, Ex. B, at 163.) He claims that his impression from meeting these employees was that all he needed to do was complete the classes, and he would be hired. (Pl. Dep. Doc. No. 12, Ex. B, 164.) Plaintiff's understanding of the Piping meetings was that he was in the door and then, sudden-

---

6. Plaintiff has presented no competent summary judgment evidence that Fletcher inter- fered with his possible transfer to the Piping Department.

ly, in March, the attitude changed. (Pl. Dep. Doc. No. 12, Ex. B, 175.) Although the evidence is weak, a reasonable jury could believe that Dunn interfered with Plaintiff's transfer to Piping, and that this, combined with Phillips failure to train him, discussed *infra*, created a pattern of racially motivated interference with his career at Jacobs such that he was terminated because of his race.

### b. Failure to train

■ A defendant's failure to train a plaintiff may be evidence of discrimination. *Patterson v. McLean Credit Union*, 491 U.S. 164, 188, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), *superceded by statute on other grounds* [7] Here, because Plaintiff does not allege a formal failure to train claim, the Court analyzes Plaintiff's evidence as circumstantial evidence of discrimination based on his race. Even when background evidence is not able to support a separate legally cognizable claim, "it may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue." *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *Crawford v. Western Elec. Co., Inc.* 614 F.2d 1300, 1314 (5th Cir.1980) (citing *Evans*, 431 U.S. 553, 97 S.Ct. 1885).

■ Phillips allegedly refused to train Plaintiff when he first arrived at the DCD.

(Pl. Dep., Doc. No. 12, Ex. B, at 62.) Plaintiff claims he informed Dunn that Phillips refused to train him, and after this meeting, he was assigned to distributing hard copies, a dead end position. (Pl. Dep., Doc. No. 12, Ex. B, at 62.) In addition, Phillips allegedly did not provide proper training, or refused to train, two other African–American employees, Linda Giles and Rhonda Cotton. (Giles Dep., Doc. No. 24, Ex. D, 21–25; 37–38, 41–42, 81.) Giles reported Phillip's reluctance to train her to Dunn. (Dunn Dep., Doc. No. 24, Ex. C, 25.) Phillips also allegedly failed to train a white employee, Tammie Ortiz, but Giles asserts that Ortiz "tended to bond more with me" and therefore Phillips would not train her as well. (Giles Letter, Doc. No. 19, Ex. D, 1.) Even though in her deposition, Giles was reluctant to infer racial animus from Phillips' failure to train three African–Americans,[8] the evidence that Phillips failed to train three African–American employees could raise an inference of race discrimination.

Dunn, on the other hand, claims that Phillips was only responsible for training Plaintiff to the extent that she had time to train him in addition to performing her own job. (Dunn Dep., Doc. No. 24, Ex. C, 31.) Because Plaintiff's computer skills were limited, Phillips had inadequate time to train him and continue her own work.

---

7. Although Plaintiff does not make out a claim for a failure to train, that claim may support a finding of disparate treatment under Title VII. *Willie Bowers v. Edgewood Independent School Dist.*, No. Civ. A. SA05CA404XR, 2005 WL 2648332, *4 (W.D.Tex. Oct. 4, 2005) (continuing violations doctrine); *Tratree v. BP North American Pipelines, Inc.*, 2006 WL 626405, *3 (S.D.Tex. 2006). To raise a claim of a failure to train, a plaintiff must show that the failure to train had a tendency to affect a plaintiff's employment status or benefits. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 407 (5th Cir.1999).

8. In her deposition, Giles was asked whether "there was a general perception by some of the African–American employees that Ms. Phillips refused to train them?"

GILES: "Now, see, I can't really say it was an African–American thing. It wasn't just African–American. If she [Phillips] just decided she wasn't going to train, she wasn't going to train. It didn't matter what your race background would be."
[MR. THOMAS–PLAINTIFF'S LAWYER]: "I'm going to object as nonresponsive." (Giles Dep., Doc. No. 24, Ex. D, 30.)

(Dunn Dep., Doc. No. 24, Ex. C, 31–32.) Dunn also claims that Phillips did not have the responsibility to train Cotton. (Dunn. Dep., Doc. No. 24, Ex. C, 24.) Dunn further claims that Jacobs offered weekly classes in JPI basics, but Plaintiff only attended five or six of the training sessions, a fact Plaintiff concedes. (Pl. Dep., Doc. No. 12, Ex. B, 123.) In addition, the DCD conducted departmental training sessions that Plaintiff did not attend because he claimed to believe they were not mandatory. (Pl. Dep., Doc. No. 12, Ex. B, 144–45.) Further, Dunn then arranged for Plaintiff to receive six weeks of individualized JPI training and basic computer skills from Courtney Fletcher, Linda Giles, and Gina Arias. (Doc. No. 12, Ex. A, ¶ 13.) Plaintiff acknowledges that he received individualized training from these individuals, but claims it only lasted one to one-and-a-half weeks. (Pl. Dep., Doc. No. 12, Ex. B, 142–43.) Throughout this later training period, Plaintiff admitted he remained disinterested in the DCD training because of his purported imminent transfer to Piping, and his primary concern was distribution—delivering mail. (Pl. Dep., Doc. No. 12, Ex. B, 123; Ex A., ¶ 9.)

In deciding motions for summary judgment, a Court may not make credibility determinations. Plaintiff has admitted that he subsequently received individualized training, although its length is disputed. A jury, however, could still conclude that Plaintiff's initial lack of training, possibly racially based, created an atmosphere where he continued to fall behind in his work such that even the subsequent individualized training could not remedy his shortcomings. A jury could therefore infer that the initial lack of training set off a chain of events that lead to a racially motivated decision to fire him.

### c. Similarly situated employees

Plaintiff claims that he was treated differently from several similarly situated non-African-American employees who were transferred to other projects at the time he was terminated. To establish that another employee is similarly situated, the plaintiff must present evidence that the conduct for which he was fired was nearly identical to that of the other employee. *See Smith v. Wal–Mart Stores (No. 471),* 891 F.2d at 1178 (holding that employee who violated a different policy of the store than plaintiff was not similarly situated); *Green v. Armstrong Rubber Co.,* 612 F.2d 967, 968 (5th Cir.1980) (holding that where one employee involved in fight was more harshly disciplined than the other, plaintiff was not similarly situated because he had been more aggressive than the other employee).

Plaintiff identifies three employees who were allegedly similarly situated. The first employee, Beverly Dye, was a Document Control coordinator, Level 2, working under Dunn. (Doc. No. 24, Ex. C, 105.) Dye fell asleep at work and was reportedly photographed asleep at her desk. (Dunn Dep., Doc. No. 24, Ex C, 111, 112–13, 113–14; Giles Dep., Doc. No. 24, Ex. D, 67–69.) Dunn had no concerns with Dye's working performance, but acknowledged that falling asleep is unacceptable behavior. (Dunn Dep., Doc. No. 24, Ex C, 116–17.) Dye was not terminated and continues to work for Defendant. (Dunn Dep., Doc. No. 24, Ex C, 105.)

Second, another employee on the Premcor Project, Nicholas Bowman, worked to close out performing data books and extracted information from the system for the Premcor Project. (Dunn. Dep., Doc. No. 24, Ex. C, 148.) In contrast, Plaintiff was responsible for delivering the mail and other documents. At the time the decision was made to terminate Plaintiff, Bowman was not terminated. He is a white male who consistently came to work late and

would not call in or place his name on the department calendar to indicate his expected absence. (Dunn Dep., Doc. No. 24, Ex. C, 103–04; Giles Dep., Doc. No. 24, Ex. D, 54–56, 62.) With regard to his work product, however, Bowman was allegedly a "good employee" and a "very proficient worker." (Giles Dep., Doc. No. 24, Ex. D, 58.) Bowman was terminated after the present lawsuit was filed because he was allegedly absent for five days, grounds for automatic termination at Jacobs. (Dunn Dep., Doc. No. 24, Ex. C, 101–02; 105.)

Third, Phillips, another employee in the DCD allegedly had insubordination problems and failed to train several employees, as discussed, *supra.* She, however, was eventually transferred, but not terminated. (Giles Dep. Doc. No. 24, Ex. D, 178.) Phillips was also competent and able to do the work, although she had trouble with her interpersonal relationships with the other employees. (Giles Dep., Doc. No. 24, Ex. D, 149; Dunn Dep., Doc. No. 24, Ex. C, 21.)

Plaintiff is not similarly situated to Phillips, Dye, and Bowman. Each of the three had work-related issues such as sleeping on the job, absenteeism, and interpersonal conflicts. However, Plaintiff has not refuted the evidence provided that each of the employees had the necessary job skills to remain in the DCD whereas he was not as skilled in JPI or other computer-related skills. An employee who is let go because he does not have the requisite skills is not similarly situated to one who is fired for misconduct. *Kline v. City of Kansas City, Fire Dept.,* 175 F.3d 660, 671 (8th Cir. 1999); *see also, Bouie v. Equistar Chemicals LP,* 188 Fed.Appx. 233, 237 (5th Cir. 2006) (employee fired for violations of safety protocol not similarly situated to employee who was caught sleeping on the job).

#### d. Race-related comments

Where there is no other evidence of pretext, race-related comments in the workplace can only provide "sufficient evidence of discrimination" if they are: "(1) related to the protected class of which the plaintiff is a member; (2) proximate in time to the employment action; (3) made by an individual with authority over the employment decision at issue; and (4) related to the employment decision at issue." *Manning v. Chevron Chemical Co., LLC,* 332 F.3d 874, 883 (5th Cir.2003). After the Supreme Court's ruling in *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Fifth Circuit has taken a more "cautious" view of the stray remark doctrine. *Palasota v. Haggar Clothing Co.,* 342 F.3d 569, 577 (5th Cir.2003); *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 229 (5th Cir. 2000) (noting that, even before *Reeves,* the Fifth Circuit had found that the 'stray remark' doctrine should be "narrowly cabined").

Race-related comments meet the 'stray remarks' test only if there is no other evidence of discrimination. *See, e.g., Auguster v. Vermilion Parish School Bd.,* 249 F.3d 400, 404 n. 7 (5th Cir.2001); *Rubinstein v. Administrators of Tulane Educational Fund* 218 F.3d 392, 400 (5th Cir.2000) (noting that the "only evidence" of discriminatory intent provided by plaintiff was the alleged stray remarks) Most cases applying the 'stray remarks' doctrine involve "overwhelming" evidence in support of the defendant's legitimate, nondiscriminatory reason. *See, e.g., Rubinstein,* 218 F.3d at 400 (discussing defendant's "overwhelming" evidence); *Auguster,* 249 F.3d at 404 (discussing the "overwhelming evidence supporting the school board's legitimate justification"); *Russell,* 235 F.3d at 229 n. 19 ("In our remarks jurisprudence, *Rubinstein* stands only for the

proposition that an overwhelming case that the adverse employment actions at issue were attributable to a legitimate, nondiscriminatory reason will not be defeated by remarks that have no link whatsoever to any potentially relevant time frame. Were we to read more into *Rubinstein* in this regard, it would be in direct conflict with *Reeves* ").

The *Russell* court clarified that generally, the value of race-related remarks "is dependent upon the content of the remarks and the speaker." *Russell*, 235 F.3d at 229 (citing *Reeves*, 530 U.S. at 151, 120 S.Ct. 2097("finding that the age-related comments further supported the jury's verdict of liability because the content of the remarks indicated "age-based animus" and the speaker was "principally responsible for [the plaintiff's] firing"))." The *Russell* court found that the remarks at issue in that case were "certainly appropriate additional circumstantial evidence of age discrimination because their content indicates age animus and the speaker . . . was primarily responsible for [the plaintiff's] termination." *Russell*, 235 F.3d at 226. *Russell* acknowledged, however, that *Reeves* would probably allow the Court to follow the traditional "stray remarks doctrine" in those cases in which "the record conclusively revealed some other, nondiscriminatory reason . . . ., or [that] the plaintiff created only a weak issue of fact as to . . . [pretext] and there was abundant and uncontroverted independent evidence that no discrimination had occurred." 235 F.3d at 229 (citing *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097).

The Court does not believe that this is a case in which Defendant has conclusively established its nondiscriminatory reason by overwhelming, uncontroverted evidence to the effect that no discrimination has occurred. In fact, the Court has already found that Plaintiff has created a fact question as to whether Defendant's legitimate, non-discriminatory reasons for not transferring him were pretextual.

In addition to the behavior of Phillips, Plaintiff claims that he was subjected to negative comments because of his race. In 2005, Jesse Evans, an employee outside the DCD initiated a conversation with Plaintiff in which he referred to himself as "white trash" and asked whether he could call Plaintiff a "nigger." (Pl. Dep., Doc. No. 12, Ex. B, 90–91.) Plaintiff reported this conduct to the Project Manager, Joe Magliaro, and learned that Evans' comments would be addressed. (Pl. Dep., Doc. No. 12, Ex. B, 94, 97.) Further, Connelly, Plaintiff's boss in 2003, allegedly referred to Hispanics as "wetbacks." (Pl. Dep., Doc. No. 12, Ex. B, at 38–40.) Plaintiff, however, admits that Connelly never made racist comments about Plaintiff specifically nor did he personally hear any racially motivated statements concerning African–Americans. (Pl. Dep., Doc. No. 12, Ex. B, 39–40.) In addition, Connelly never provided a formal review of Plaintiff's performance at Jacobs. (Pl. Dep., Doc. No. 12, Ex. B, 50.) Plaintiff allegedly did not complain about these comments because he knew that Connelly had a personal relationship with the Human Resource Director, John Kadash, and because Plaintiff was no longer working for him. (Pl. Dep., Doc. No. 12, Ex. B, 40–41; 44–45.) Finally, Don Foreman, a non-management employee allegedly made a statement to Plaintiff that he should put "people like you back in their place," in the context of a discussion about an employee with whom Plaintiff was rumored to have a relationship. (Pl. Dep., Doc. No. 12, Ex. B, 169, 172.) The meaning of this statement is unclear. However, because all of these individuals were not ultimately responsible for the decision to terminate Plaintiff, and the comments were not relat-

ed to the decision to terminate him, these remarks do not present summary judgment evidence to establish Plaintiff's case for pretext.

### e. Giles Letter

Plaintiff offers a letter written by Giles in which she states that the "color of his skin" may have motivated the decision to terminate him.[9] (Doc. No. 19, Ex. D, 3.) In her deposition, however, she explained that this statement was based on the different treatment Plaintiff received compared to Phillips, which, as discussed above, is not relevant because Phillips and Plaintiff were not similarly situated. (Giles Dep., Doc. No. 24, Ex. D, 178.) Further Giles admitted that Phillips and Plaintiff had separate issues at work— Giles agreed that Phillips appeared to have an "attitude problem" and Plaintiff had some "performance problems." (Giles Dep., Doc. No. 24, Ex. D, 175.) In addition, in her letter, Giles refers to a "hostile" work environment. (Doc. No. 19, Ex. D, 3.) Giles admitted in her deposition that she was referring to "work issues," "not racial issues." (Giles Dep., Doc. No. 24, Ex. D, 162.) At first read, Giles' letter appears to present evidence that race animated the decision to fire Plaintiff; combined with her explanations, it does not present evidence that race motivated the decision to fire Plaintiff.

■ Despite this conclusion, in light of the Supreme Court's decision in *Reeves,* Plaintiff has successfully presented a case that must be decided by a jury, not the Court. Plaintiff established that Defendant's reason for determination may not be worthy of credence and has put forward some, albeit weak, evidence of discrimina-

tion, and summary judgment is not appropriate at this stage of litigation. *See Reeves,* 530 U.S. at 148, 120 S.Ct. 2097. The Fifth Circuit has explained its permissive standard for allowing discrimination cases to proceed to trial. Unless there are "unusual circumstances" that would prevent a rational fact-finder from concluding that the employer's reasons for failing to promote him were discriminatory, a plaintiff may proceed to trial once he has asserted a prima facie case and created an issue of material fact over the employer's proffered reason for termination. *Blow v. City of San Antonio, Tex.,* 236 F.3d 293, 298 (5th Cir.2001). As examples of these unusual circumstances, the *Reeves* Court explained that "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves,* 530 U.S. at 148, 120 S.Ct. 2097. While it is a close case, the Court finds that the record does not conclusively reveal another reason for Plaintiff's termination, or uncontroverted evidence that no discrimination occurred.

### IV. SEX DISCRIMINATION

#### 1. Prima Facie Case

■ The standard for a prima facie case of Title VII/Section 1981 sex discrimination is the same as that for race discrimination. Defendant argues that Plaintiff has admitted that he lacks any specific evidence of sex discrimination beyond his own subjective belief. (Pl. Dep., Doc. No.

---

**9.** Giles admits to writing the letter in her deposition testimony. Defendant's objections to the admissibility of the letter are noted. (Doc. No. 23, at 10–11.) As the Court does not rely on any of the allegations included therein as proper summary judgment evidence, Defendant's objections are moot.

12, Ex. B, 53, 179.) Plaintiff contends that his sex and race motivated alleged statements by Dunn and others about a rumored relationship between Plaintiff and an Asian employee. Plaintiff, however, presents no evidence that sex motivated the decision to terminate him beyond his own statement that "most black men are considered intimidating." (Pl. Dep. Doc. No. 12, Ex. B, 179.) A plaintiff's subjective beliefs and conclusory allegations regarding sex discrimination are insufficient to support a finding of discrimination. *See Ramsey v. Henderson,* 286 F.3d 264, 269 (5th Cir.2002). Further, all of the alleged statements about the rumored relationship are hearsay, and not properly considered as summary judgment evidence. *Harvey v. Chevron U.S.A., Inc.,* 961 F.Supp. 1017, 1031 (S.D.Tex.1997).

## V. CONCLUSION

Defendant's Motion for Summary Judgment is **DENIED** as to Plaintiff's race discrimination claim but **GRANTED** as to his sex discrimination claim.

**IT IS SO ORDERED.**