NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0428n.06

No. 10-6120

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| JERRY SANDER, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| GRAY TELEVISION GROUP, INC., | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

FILED

*Apr 18, 2012*

LEONARD GREEN, Clerk

BEFORE: MERRITT and ROGERS, Circuit Judges; POLSTER, District Court Judge.[*]

ROGERS, Circuit Judge. In this age discrimination case, Jerry Sander appeals the grant of summary judgment to Gray Television Group, Inc. on Sander's ADEA, retaliation, and breach of contract claims. Sander was a television reporter for WKYT-TV from 1981 until 2008. On February 21, 2008, after refusing to complete a routine assignment, Sander walked out of the station telling three individuals that he was "going to quit." Because Sander voluntarily resigned from his position, and thus cannot prove a prima facie case of age discrimination or retaliation, the district court properly granted summary judgment. Moreover, even if Sander could establish a prima facie case for either claim, he in any event cannot demonstrate that Gray Television's legitimate, non-

---

[*] The Honorable Dan A. Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

discriminatory reason for his termination, namely Sander's own misconduct, was pretextual, and thus summary judgment was warranted on this ground as well.

## I.

Jerry Sander, who was born in 1946, began working for WKYT in Lexington, Kentucky as a television news reporter in 1981. He continued in that position until February 21, 2008, when Sander allegedly quit and walked out of the station.

When Gray Television bought WKYT in 1993 or 1994, Sander became an employee of Gray Television. During his years at WKYT, Sander was known for his health/medical feature stories, and he was often asked to report on election night coverage from major campaign headquarters. R.65, Martin Dep., at 39-40. In 2004, when Jim Ogle was the Vice President of News, Sander was offered an eight-year employment agreement and was promoted to Senior Reporter. As part of the agreement, Sander's salary steadily rose each year, from $77,510 in 2005 to $96,510 in 2012. R.57-1, at 2. At the time, Sander was the highest paid reporter at WKYT.

The agreement included the following "Duties of Employee," stating that "the Employee shall:"

(A)     Promptly and in good faith comply with all directions, requests, requirements, rules and regulations made by Employer in the conduct of its business.

(B)     Fulfill the duties of Senior Reporter and perform such services as Employer, in its exclusive discretion, shall designate with respect to broadcasts produced by Employer . . . Employer reserves the right to alter Employee's duties, as it deems appropriate.

R.66-1, Employment Agreement, at 1.

The agreement also included the following provision related to "[t]ermination [of] . . . this Agreement prior to the scheduled completion of its term:"

> (A)    <u>TERMINATION FOR CAUSE.</u> Employer can terminate this Agreement, (or suspend Employee without pay at Employer's option) if Employee:
>
> > (2)    Fails to perform any of his obligations set forth herein, or which are natural incidence to performance of his duties or employment responsibilities, by willful default, neglect or misconduct;
> >
> > (3)    Fails to comply with any of the rules and policies established by Employer;
> >
> > (4)    Fails to comply with any of the terms of this Agreement.

*Id.* at 3-4.

In August 2006, Robert Thomas was hired as the new Vice President of News, replacing Jim Ogle, and Thomas became Sander's immediate supervisor. In light of Thomas's desire to "emphasize breaking news," WKYT became a more "aggressive" news organization. R.62, Bryant Dep. at 36. Wayne Martin, general manager of the station, testified that Thomas had a different "philosophy [for] running a newsroom . . . quite different than the previous news director." R. 65, Martin Dep. at 63. Most noticeably, Thomas wanted to "be directly involved on a daily basis with reporters." *Id.* With Martin's approval, in 2006 Thomas removed the Senior Reporter designation from Sander's title. *Id.* at 62. Sander claims that Thomas also "reassigned Sander from live reporting from campaign headquarters to reporting in 'quick tapes' in local races, during the 2006 election." Appellant Br. at 10. Sander also alleged that although his duties as the health and medical reporter had been scaled down prior to Thomas's arrival, "[o]nce Thomas became the News Director, he no longer used Sander's expertise, electing to assign health coverage through the general assignment

3

pool." R.62, Bryant Dep. at 54-55. In 2007, after working the same day shift for nearly 27 years, Sander was reassigned to the morning shift, which required arriving at 4 a.m. R.72, Thomas Dep. at 70-71. Less than two months later, Thomas returned Sander to the day shift "without explanation." R.72, Thomas Dep. at 76-77.

In January 2008, Sander met with Martin to discuss Sander's belief that Thomas was "out to get him." Martin assured Sander that this was not the case, and that the "only question that [Thomas] had raised with [Martin] involved [Sander's] appearance." R.65, Martin Dep. at 42-44. Sander also expressed concern that Thomas's philosophy in the newsroom was "[i]f it bleeds, it leads," meaning that WKYT focused on "covering fires and shootings and car wrecks at the expense of more human interest type of stories." *Id.* at 42-43. Sander claims that Thomas repeatedly asked him about his intent to retire, R.66, Sander Dep. at 38-39, 44-45, and often referred to Sander as "old-school" or "old." *Id.* at 35-36, 45-47.

On February 20, 2008, Thomas sent a memorandum to all news reporters and anchors to let them know that starting the following Monday, February 25, 2008, they would all be required to web produce their own stories. The next day, on February 21, a refresher course for posting stories on the web was held at 8:15 a.m. That same day, a winter storm was approaching, and because it was a "big story," Sander "wanted a piece" of it. R. 66, Sander Dep. at 155. However, just prior to the 9:30 a.m. daily meeting, Thomas told Sander that he would be the "web producer of the day." *Id.* Sander was upset, and asked if he was being punished. When Thomas told him no, that all the reporters were going to do it, Sander figured the task was not time sensitive and "that [he] could get the hang of it basically and muddle through it." *Id.* at 155-56. Later, during the daily meeting,

4

Michelle Hill, the Executive Producer, suggested that Sander also manage "SnoGo," the station's automated system for reporting school and business closings during inclement weather. This announcement "set [Sander] off." *Id.* at 159. In front of all of the participants at the daily meeting, Sander responded: "I can't do Snow Go [sic]. I wouldn't know how to even start, what button to push. I have absolutely no training in this. I don't know how to do it and I won't do it." *Id.* at 159-60. According to Sander, Thomas "yell[ed] very loudly," saying "something to the effect" of "don't you ever tell me what you will or will not do." *Id.* at 162.

As a result of his emotional distress from all of the yelling, Sander became ill. Sander asked Thomas if he could leave, and Thomas told Sander to leave and not to come back until Thomas let him. R.72, Thomas Dep. at 132-133. Sander then asked for permission to speak with Wayne Martin, the General Manager of the station. Sander went directly to Martin's office, and Deanna Wolfe, Martin's assistant, told Sander that Martin was out of town producing a story in Minnesota. After looking for Mike Kanarek, the Vice President of Operations, and not finding him, Sander then told Wolfe, "I can't take this anymore, I'm going to quit." R. 66, Sander Dep. at 162-169. Though this is the wording that Sander recalls, and emphasizes throughout his brief, see Appellant Br. at 27, Wolfe testified at her deposition that Sander said "I quit" or "I'm quitting," and she "kn[e]w for sure that he didn't say 'I'm going to quit.'" R.69, Wolfe Dep. at 13-14.

Sander then returned to the conference room to retrieve his jacket, hat, gloves, and earmuffs, as well as his bag with his notebooks for the day. R. 66, Sander Dep. at 172. At the end of the lobby, Sander said "doggone it," and tossed his papers down. *Id.* at 173. Before leaving the station, Sander said to Thomas, "well, now you have the money [Sander's salary] that you have been trying to get

for so long." *Id.* at 174. While walking out, Sander ran into a friend, master control operator Billy Hall. Sander told Billy that he was "going to quit." *Id.* at 175. Hall had known Sander for many years and did not believe that Sander seriously intended to quit. R.63, Hall Dep. at 19-20.

After returning home, Sander contacted his wife, Karen, who came home from work to be with him. Mrs. Sander called Wolfe to tell her that her husband was very upset and that he did not mean to say that he was quitting. *Id.* at 179-181. Wolfe told Mrs. Sander that she does not "have the authority to accept resignations." *Id.* at 181. Mrs. Sander then attempted to call human resources, but found out that they were located in Georgia. *Id.* at 183. Sander also asked his wife to call Tom Laytek, the assignment editor, to determine if Sander had been taken off the schedule for Friday, February 22. Laytek said that he had. *Id.* at 184. Later that afternoon, Thomas called Sander, but after Sander became agitated Thomas spoke with Mrs. Sander. Thomas told Mrs. Sander that Sander's status at that time was that "he had quit and that [Thomas, Sander, and Martin] would revisit and . . . discuss things on Monday when Wayne return[ed]." R.72, Thomas Dep. at 135-36. Later, Martin called to set up a meeting for Monday morning. R.65, Martin Dep. at 70. When Sander asked whether he had lost his job, Martin responded, "no, nothing like that." Appellant Br. at 16, citing R.67, Sander Dep. II at 30-31.

On Monday, February 25, 2008, Thomas, Martin, and Sander met to discuss the situation. At the meeting, Sander read a prepared statement. R. 66, Sander Dep. at 194. In the statement, Sander admitted telling his "supervisor [that] I would not do something," not because the task was "beneath" him but rather because "the task was above" him. R.67-1, Jerry's Statement, at 1. In his bullet-pointed notes, titled "Thoughts - Jerry," Sander wrote that he "feel[s][Thomas] wants me to

leave and void my contract and others have expressed to me their observation that I am correct." *Id.* at 3. Sander also stated that he had "recently come into possession of documented information of a plan to rid WKYT not only of [Sander] but also several other key people in the newsroom." *Id.* While Sander refused to name the intended targets, he stated that the plan "appear[ed] to be money, personality, and age/appearance based." *Id.* Sander further alleged that the newsroom had an "atmosphere of fear and intimidation" and was a "hostile work environment," and claimed that he had been the subject of a constructive termination. *Id.*

At the end of the meeting, Martin told Sander that Martin had four possible courses of action: "[a]ccept [Sander's] resignation with no severance; terminate him for cause; accept his resignation with severance; or accept his request to return to work." R. 65, Martin Dep. at 70. Sander indicated that he would like to return to work, but also noted that "there must be some stipulations or next week I will be terminated for not wearing the right color of tie." R.67-Jerry's Statement, at 3. These stipulations included being "treated with respect and dignity" with "no more public screaming" directed towards Sander. *Id.* at 4. He also hoped that "some form of recourse" would be available to him when "boundaries" were inevitably crossed again. *Id.* In response, Martin told Sander that he would "get back with him as soon as possible after trying to evaluate what [Sander] said and what . . . had occurred." R. 65, Martin Dep. at 70. After further investigation, Martin decided that he would not take Sander back as an employee because doing so would "undermine the management of the newsroom and set a precedent allowing someone to quit, after refusing . . . a routine assignment." *Id.* at 113. Prior to Martin's informing Sander of his decision, Thomas recommended

to Martin that they contact Gray Television's lawyers because "knowing Jerry . . . [Gray Television] would end up at this point sitting at this [litigation] table." R. 72, Thomas Dep. at 146-47.

On or about February 29, 2008, Martin told Sander that he accepted his resignation and "offer[ed] [Sander] a severance with a condition of signed release." R. 65, Martin Dep. at 69. Martin testified that he did not terminate Sander for cause "[b]ecause [Sander] had resigned. He told at least three people he had resigned." *Id.* at 78. Martin further explained that "frankly, [he] thought [Sander's] years of service were worth [his] considering [Sander's] having severance." *Id.* Sander did not accept the offer.

Sander filed a complaint against Gray Television alleging age discrimination in violation of the ADEA and the Kentucky Civil Rights Act (KCRA), retaliation, and breach of contract claims. In response, Gray Television filed a motion for summary judgment. The district court granted Gray Television's summary judgment motion on all claims. With regard to Sander's ADEA and KCRA claim, the district court held that Sander could not prove a prima facie case of age discrimination because he "voluntarily quit and walked out of WKYT that morning." R. 86, District Court Order, at 13. The district court also determined that Sander could not meet his burden of proving that "'but for' his age, he would never have lost his job," *id.* at 14, because Sander could not identify another employee "who refused an assignment in an open meeting, went home and was later allowed to return to work."

The district court further held that, even if Sander could have presented a prima facie case, Sander could not demonstrate that Gray Television's legitimate, non-discriminatory reason for its decision was pretextual. *Id.* Although Sander admitted that he refused an assignment in an open

meeting, he argued that Thomas "harbored an age-related bias against Sander" and that this was the real motivation for his termination. *Id.* at 14-16. The district court rejected this claim, noting that Thomas's concerns with Sander's energy were not related to an age-related bias; instead, Thomas was "simply disappointed in Sander's level of enthusiasm on the air." *Id.* at 16. Therefore, the district court held that Sander was unable to show that it was Sander's age, not his words and actions on February 21 and 25, 2008, that motivated Gray Television's decision to terminate his employment. *Id.* at 17.

As for Sander's retaliation claim, the district court held that Sander could not support a retaliation claim because he was not terminated or constructively discharged. *Id.* at 18. In addition, the district court determined that there was no causal connection between Sander's age discrimination complaints and his subsequent termination because "[n]o reasonable jury could infer that the decision to accept Sander's resignation was unrelated to his misconduct." *Id.*

Finally, the district court granted Gray Television's summary judgment motion with regard to Sander's breach of contract claim because under the terms of the employment agreement it was Sander, not Gray Television, who had breached the contract. *Id.* at 21. Under the agreement, Sander was "required to promptly and in good faith comply with *all* directions, requests, requirements, rules and regulations made by the Employer"; by refusing to manage SnoGo, Sander "failed to perform his duties under the Agreement." *Id.* (citations and brackets omitted).

Sander appeals, raising his age discrimination, retaliation, and breach of contract claims.

II.

A. Sander voluntarily resigned

The district court correctly held, as a matter of law, that Sander voluntarily resigned from his position as a reporter at WKYT. Sander's own words and actions support the district court's determination that Sander voluntarily terminated his employment with Gray Television Group, Inc. First, Sander told three different individuals at work—Hall, Thomas, and Wolfe—that he planned on quitting. Even though Hall did not believe that Sander seriously intended to quit, R.63, Hall Dep. at 19-20, this does not change the fact that Sander explicitly expressed this intent. Similarly, telling his direct supervisor, Thomas, "now you have the money [Sander's salary] that you have been trying to get for so long," R. 72, Thomas Dep. at 174, strongly conveys that Sander intended to leave Gray Television permanently. Second, Sander told his wife, Karen, that he had told Wolfe that he "was quitting." R.66, Sander Dep. at 179-80. Third, according to a Herald Leader news article discussing the lawsuit, "Sander said he told one person at the station, Martin's secretary, that he quit but later called to say that he was emotional and didn't mean it." R.53-13, Lexington Herald Leader Article, at 3. According to Sander's own recollection of the events, he intended to quit, and it was reasonable for the people around him to believe that he was resigning.

Sander argues that because he told no one in a position in authority that he planned to quit, he did not officially resign his position. However, Sander did tell Thomas, his direct supervisor, that he was quitting, and Thomas believed he had quit after Sander left the station during the middle of the workday. R.72, Thomas Dep. at 136. Although Thomas admitted that after speaking with Sander's wife he knew that Sander "didn't mean to quit," *Id*. at 140-141, this does not change the fact that Sander's actions the morning of February 21 indicated that he had quit. In addition, Sander told General Manager Wayne Martin's assistant, Deanna Wolfe, that he was going to quit, and it

would be unreasonable to think that she would not report this to her boss. Wolfe even told Sander that she was going to have to "pass[ ] along that information" to both Martin and Thomas. R. 69, Wolfe Dep. at 17.

Sander also claims that "a jury could . . . conclude that Gray Television could not have accepted Sander's resignation . . . based on Martin's assurances to Sander on February 21, 2008." Appellant Br. at 12. Though Sander states that Martin told him that he had not lost his job, Martin testified that he simply had a "situation where at least two people told me Jerry resigned and Jerry's telling me he didn't mean to resign and he wanted his job back. So I set up a meeting on Monday." R. 65, Martin Dep. at 70. When Martin presented Sander with the four options available to Gray Television at the Monday, February 25, 2008, meeting, Martin believed that Sander had resigned and that accepting his resignation was a valid course of action for Gray Television. *Id.* Sander further argues that Martin had "*never* met with any other resigning employee to discuss different options including staying at WKYT," Appellant Br. at 24 (emphasis in the original), and that this is sufficient evidence that Sander had not resigned. However, Sander's situation was likely unique, and that Martin may have wanted to give Sander a chance to explain himself after his years of service. R.65, Martin Dep. at 78.

Sander relies on the fact that Thomas had suspended Sander and that Sander also reasonably believed that Thomas intended to fire him. Again, these claims do not change the implications of Sander's own words and actions. Even if Sander had been suspended, this does not mean that he could not quit; nothing suggests that an employee on suspension cannot offer his resignation. Similarly, Sander's belief that Thomas was going to fire him does not alter the fact that Sander

11

preemptively quit and told Thomas, before Thomas could say anything about firing him, that Thomas now had Sander's income at his disposal. R. 72, Thomas Dep. at 174.

Sander tries to explain his actions by suggesting that he had no intention of quitting but was "simply vent[ing]" to co-workers because he was "distraught." Appellant Br. at 24; Reply Br. at 7. During his deposition, Sander states that after leaving the station he was so upset, his wife had to call WKYT to explain that he "didn't mean to say that he was quitting." R. 66, Sander Dep. at 179-184. However, the fact that Sander's wife had to call to explain that he "didn't mean to quit" instead suggests that reasonable people could have interpreted Sander's words and actions, such as throwing paper and leaving the station, as a clear indication that he had quit. The district court correctly determined that, even if Sander was upset, "[a]n employee is not entitled to walk out on a job merely because he cannot control his temper." R.86, District Court Order, at 13.

Sander also asserts that he could not have resigned because he could not unilaterally terminate his agreement without written notice to Gray Television. However, the provision of the employee handbook upon which Sander relies, that an employee must give a "two-week written notice of the intent to terminate employment," refers to unused vacation time. R.57-4, Employee Handbook at 2. There is nothing in the handbook or in the agreement to suggest that an employee at Gray Television could not terminate his employment without providing written notice.

Finally, Sander hypothesizes that Gray Television "exaggerat[ed]" his frustrations and "fabricat[ed] a 'quit' out of his actions" because Gray Television needed to cut expenses. However, as the district court reasoned, Sander's argument "ignores the fact that Sander refused an assignment and admitted telling two people he quit." R.86, District Court Order at 13. When asked if Sander's

termination was related to a desire to cut expenses, Martin responded that Sander's leaving "had to do with him quitting and me believing that allowing him to return would very much undermine the management of the newsroom and set a precedent allowing someone to quit, after refusing . . . a routine assignment." R. 65, Martin Dep. at 113.

Sander's actions, and his own account of what happened on February 21 and 25, 2008, support the district court's determination that there was no genuine issue of material fact as to whether Sander voluntarily resigned his position as a reporter at WKYT.

B.  ADEA claim

Morever, even if Sander had not voluntarily resigned, Sander's age discrimination and retaliation claims must still fail for other reasons.  First, Sander has not identified genuine issues of material fact sufficient to support a claim of age discrimination against Gray Television under the ADEA, 29 U.S.C. § 623, and the Kentucky Civil Rights Act (KCRA), K.R.S. § 344.040.  Claims alleging age discrimination under the KCRA are "analyzed in the same manner" as ADEA claims, *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 393 (6th Cir. 2008).

As the parties do not dispute that Sander was at least 40 years old at the time of the alleged action and that he was otherwise qualified for the position, to demonstrate a prima facie case of age discrimination Sander must only: (1) prove that he suffered an adverse employment action, and (2) demonstrate that he was "replaced by someone substantially younger," *Browning v. Dept. of Army*, 436 F.3d 692, 695 (6th Cir. 2006), or "treated differently from similarly situated employees outside the protected class," *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir.

13

2008). If Sander quit, then he did not suffer an adverse employment action, and thus cannot prove a claim of age discrimination.

However, regardless of whether Sander quit or not, he still cannot establish a prima facie case of age discrimination because he cannot demonstrate either: (1) that he was replaced by a substantially younger employee, or (2) that he was treated differently than similarly situated but younger employees. First, Sander argues that he was replaced by Tamara Evans, who was hired in May 2008 and was nearly 40 years younger than Sander. But a number of other staff members, including Constance Weaver and DeAnn Stephens, left in the four-month period between Sander's departure in February 2008 and June 2008, when Weaver left the station. R.72, Thomas Dep. at 81-84. Though Stephens left in May 2008, Thomas testified that she gave a "notice period [of] a month," so it is possible that Evans was hired to fill Stephens's position, not Sander's. Sander counters that Evans was a general assignment reporter, like himself, and that no other general assignment reporters left during this time. However, though Stephens was an anchor, she also did some reporting. R.72, Thomas Dep. at 84. Therefore, Sander's argument that Evans was hired specifically to replace him appears to be mere conjecture.

Sander also argues that he can meet his *prima facie* burden by demonstrating that significantly younger employees were treated better than he was. Sander notes that Cunningham, Charles, and Kennedy, all younger reporters, were assigned election night coverage, whereas Sander did not cover election night in 2007. Because Gray Television was allowed to assign reporters as needed under the terms of its employment agreement, this one fact does not suggest that the younger reporters were "treated better." Sander was the highest paid reporter at WKYT at the time. Even

more importantly, as the district court noted, Sander could not "identify another employee, regardless of age, who refused an assignment in an open meeting, went home and was later allowed to return to work." R.86, District Court Order, at 14. As Sander does not provide any evidence of another employee who engaged in a similar level of misconduct who was then allowed to continue working at Gray Television, he cannot meet the fourth prong of his prima facie age discrimination claim.

Even if Sander could prove a prima facie case of age discrimination, he cannot credibly argue that it was his age, and not his refusal to complete a routine work assignment, that led to his termination. Under *McDonnell Douglas*,[1] if the plaintiff establishes a prima facie case, an employer may provide a legitimate alternative reason for the discharge, which shifts the burden back to the plaintiff to show that the proffered reason was only a pretext. *Allen*, 545 F.3d at 394. Because Sander cannot rebut Gray Television's proffered legitimate, non-discriminatory reason for his termination, he cannot prevail on his age discrimination claim.

Gray Television maintains that Martin decided that he would not take Sander back as an employee because doing so would have "undermine[d] the management of the newsroom and set a

---

[1] This circuit has recognized that:

> [T]he Supreme Court expressly declined to decide whether the *McDonnell Douglas* test applies to the ADEA. . . . In this circuit, however, while recognizing the differences between Title VII and the ADEA, we have long found the *McDonnell Douglas* framework useful in analyzing circumstantial evidence of ADEA claims. The *McDonnell Douglas* test thus remains applicable law in this circuit, and we are without authority to overrule prior published decisions of our court absent an inconsistent decision of the Supreme Court or an *en banc* reversal. Consequently, we find that the *McDonnell Douglas* framework can still be used to analyze ADEA claims based on circumstantial evidence.

*Geiger v. Tower Automotive*, 579 F.3d 614, 622 (6th Cir. 2009)(citations omitted).

precedent allowing someone to quit, after refusing . . . a routine assignment." R.65, Martin Dep. at 113. *See also Arnold v. Marous Bros. Const., Inc.*, 211 F. App'x 377, 381 n.1 (6th Cir. 2006). Although Sander was not terminated for cause "[b]ecause he had resigned" and because "his years of service were worth . . . considering him having severance," *Id.* at 78, this does not mean that Gray Television did not have grounds for terminating Sander for cause if it had chosen to do so.

Sander has not raised a genuine issue of material fact that Gray Television's proffered reason for his termination, Sander's own misconduct, is not credible. To show that Gray Television's proffered reason lacks credibility or is a mere pretext for discrimination, Sander must show by a preponderance of the evidence "either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge." *Hedrick v. Western Reserve Care System*, 355 F.3d 444, 460 (6th Cir. 2004). As Sander is unable to do any of these, Sander cannot rebut Gray Television's legitimate, non-discriminatory reason for his termination.

To show Gray Television's illegal motives, Sander first argues that WKYT targeted the two oldest reporters, Sander and Denny Trease, who is 6 months younger than Sander. Trease testified that he felt that Thomas was "ashamed of having gray-haired reporters on his staff," and that he and Sander were specifically cut out of promotional materials for the station. R.68, Trease Dep. at 53-56. While this testimony may be damaging to Gray Television, it is not enough to support Sander's claim that Gray Television's motive was discriminatory. This court has determined that although "other employees might be able to establish a *prima facie* case of age discrimination," that "in no way

establishes that the defendant's reason for discharging the plaintiff was pretext for age discrimination." *Johnson v. Interstate Brands Corp.*, 351 F. App'x 36, 41 (2009).

Second, Sander points to Thomas's questions about his impending retirement, his numerous reassignments in the months leading up to his termination, and the fact that some of his story pitches were not used as evidence of Gray Television's illegal motive. However, this evidence falls short of rebutting Gray Television's non-discriminatory reason for ending Sander's employment. During his testimony, Sander admitted that he did not know if Thomas's questions about his retirement may have been for the legitimate purpose of planning for potential hires in the future. R. 66, Sander Dep. at 38-39. With regard to his story ideas and the reason behind his reassignments, Sander merely speculates that these decision were motivated by age bias, *id.* at 140-41, and this court has held that "a plaintiff's conclusory allegations and subjective beliefs are not a sufficient basis to deny summary judgment." *Johnson*, 351 F. App'x at 42. According to Sander's employment agreement, Gray Television had the "exclusive discretion . . . to alter [Sander]'s duties, as it deems appropriate." R. 66-1, Employment Agreement, at 1. Thus, Gray Television was fully within its right to reassign Sander to different shifts. This is especially true in light of Thomas's concerns that Sander was not meeting expectations. R. 72, Thomas Dep. at 71-73, 76-78. Thomas also stated that it was common to reassign younger reporters, which suggests that Sander's reassignments do not reflect age-bias on the part of Gray Television. *Id.* at 98-99.

Sander also argues that he was assigned tasks, namely web producing and SnoGo, that "he was not qualified to perform." Appellant Br. at 51. Gray Television offered a legitimate reason for requesting that Sander web produce that day; according to Thomas, he asked Sander to post stories

so that Sander could "use the new skills he had just learned in a training session and get better at posting stories by using that day as an opportunity to use those skills." R.72, Thomas Dep. at 171-72. Likewise, SnoGo was considered a "routine" assignment, one that under Sander's employment agreement he was not in a position to refuse. Martin Dep. at 113.

Finally, Sander points to comments that he was "old" or "old-school" as evidence of Gray Television's age-related bias and illegal motivation in accepting his resignation. *Id.* at 54-58. If Sander could credibly prove that these comments occurred, this would support his claim that Gray Television had a discriminatory motive. In *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998), this court held that discriminatory remarks "buttress one another as well as any other pretextual evidence supporting an inference of discriminatory animus." However, not only has Sander not provided any other pretextual evidence, but as the district court noted Sander could not remember the circumstances for the majority of the alleged discriminatory comments. R.86, District Court Order, at 10; *see also Johnson*, 351 F. App'x at 42. During his deposition, Sander could only recall Thomas and Hill, who was not his supervisor, making these types of comments. R.66, Sander Dep. at 51. To the extent that these comments were "isolated and ambiguous," this court has held that these types of remarks "are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination." *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993)(citations omitted). Notably, though Thomas was Sander's direct supervisor, neither Thomas nor Hill was in the position to terminate Sander; that was Martin's decision.

Sander claims that Thomas "admitted that he harbored an age-related bias against Sander." Appellant Br. at 55. However, to support this claim Sander can only point to Thomas's comments regarding Sander's "weak" energy levels and his perceived reluctance to change. R.72, Thomas Dep. at 172-173. The "perceived reluctance to change" was in relation to Sander's disgruntled attitude toward learning to post stories on the web, which is not necessarily age-related. As for the "weak" comment, as the district court explained, one's energy level is not only not necessarily related to age, but also is essential to the success of a television station. R.86, District Court Order, at 16.

With his ADEA claim, "the ultimate burden of persuasion remains on [Sander] to demonstrate that age was the 'but for' cause of [Gray Television's] adverse action." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). Because Sander did not raise a genuine issue of material fact that he was replaced by a substantially younger employee, treated differently than similarly situated employees, or rebut Gray Television's claim that Sander was fired for his own misconduct, the district court correctly granted Gray Television's summary judgment motion on Sander's age discrimination claim.

## C. Retaliation claim

As with Sander's age discrimination claim, the fact that Sander voluntarily resigned from his position as a reporter with WKYT precludes a prima facie case of retaliation because he did not suffer an adverse action. But, even if Sander did not quit, he has not raised a genuine issue of material fact with respect to a causal link between his protected activity and the adverse action, and summary judgment of Sander's retaliation claims therefore was also warranted on this basis. Sander asserts his retaliation claim under both federal and Kentucky law. *See* K.R.S. § 344.280. Again,

Kentucky courts interpret the Kentucky Civil Rights Act in a manner consistent with federal law. *Howard Baer, Inc. V. Schave*, 127 S.W.3d 589, 592 (Ky. 2003).

Sander is unable to show that, if he suffered an adverse action, that this adverse action is causally connected to a protected activity. To meet his burden in demonstrating a prima facie showing of retaliation, Sander must prove that "(1) he engaged in a protected activity, (2) the activity was known to [Gray Television], (3) [Sander] was subject to materially adverse action, and (4) there was a causal connection between the protected activity and the adverse action." *Harris v. Metro. Govt. of Nashville and Davidson Cnty.*, 594 F.3d 476, 487 (6th Cir. 2010). As Sander explicitly shared his complaints regarding age discrimination with Gray Television in the February 25 meeting, the parties only dispute the following three elements: (1) whether a protected activity existed, (2) whether Sander suffered from an adverse action, and (3) whether there was a causal connection between his complaints and his subsequent notice of termination, which Martin gave Sander only a few days later.

Although "a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice," *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313 (6th Cir. 1989), we will assume for the sake of argument that Sander did engage in a protected activity.

However, even if Sander engaged in a protected activity, he still cannot prove the fourth element of a prima facie case of retaliation, namely that a causal link exists between Sander's protected activity and his termination. Even assuming that Sander did not resign on February 21, and thus was not terminated from his position until on or about February 29, Sander still cannot meet

his burden. This court has held that a plaintiff must offer evidence that is "sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *E.E.O.C. v. Avery Dennison Corp.,* 104 F.3d 858, 861 (6th Cir. 1997) (citing *Zanders v. Nat'l R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990)). Although there are instances where temporal proximity may be enough to establish a causal connection, *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004), under the *McDonnell Douglas* framework, "[d]espite the shifting burdens of production, the ultimate burden of persuasion remains at all times with the plaintiff." *Lindsay v. Yates*, 578 F.3d 407, 421 (6th Cir. 2009) (internal quotation marks omitted). Because the circumstantial evidence provided by Sander can be easily rebutted, and Gray Television has offered legitimate reasons for Sander's termination, Sander has not sufficiently demonstrated that there was a causal connection between his complaints on February 25 and the official notice of his termination on or about February 29.

Sander provides the following "additional evidence" from which he argues "a reasonable jury could conclude that Gray Television retaliated against him": (1) prior to the meeting on February 25, 2008, both Thomas and Martin considered allowing Sander to return to work, R.65, Martin Dep. at 72; R.72, Thomas Dep. at 142, and the decision that he could not return to work occurred "only after Sander complained of age discrimination"; and (2) after the meeting, but prior to notifying Sander of his termination, Thomas told Martin that he should contact Gray Television's lawyers because "knowing Jerry . . . [Gray Television] would end up at this point sitting at this table." Appellant Br. at 40-41, citing R.72 Thomas Dep. at 147. Neither incident is sufficient evidence that Gray Television's motives were retaliatory.

First, although Martin and Thomas may have considered allowing Sander to return to work, prior to the February 25 meeting both agreed that accepting Sander's resignation was a viable option. Though Sander argues that his complaints about age discrimination led to his termination, Martin explained that he set up the meeting in order to hear Sander's side of the story. After the meeting, Martin told Sander that he "would get back with him as soon as possible after trying to evaluate what he said and what he said had occurred." R.65, Martin Dep. at 70. After hearing Sander's side of the story and his lack of remorse, Martin could have determined that allowing Sander to return to work was not the best course of action, and this decision could have had nothing to do with Sander's age discrimination complaints.

Second, Thomas's offhand comment does not sufficiently create an inference that but for Sander's complaints of age discrimination he would not have been terminated. If anything, the comment most directly addresses how Sander responds to controversy, not Gray Television's alleged illegal motives for the termination. Companies that terminate employment relationships for legitimate reasons often choose to speak with counsel; therefore, Gray Television's choice to do so here does not necessarily support a conclusion that Sander was fired in retaliation for complaints about age discrimination.

As with Sander's age discrimination claim, if Sander were able to meet his prima facie showing of retaliation, the burden would shift to Gray Television to offer a legitimate, non-retaliatory reason for its action that Sander would then have to prove was merely a pretext for retaliation. *Harris*, 594 F.3d at 487. For the reasons already discussed in Section II.B., Sander

cannot prove that Gray Television's proffered motives were pretextual. Therefore, his retaliation claim fails on this basis as well.

D. Breach of Contract claim

Based upon the plain language of the employment agreement, R.66-1, Employment Agreement, at 1, the district court also properly determined that, because Sander refused an assignment in an open meeting, Gray Television did not breach the contract. Sander's employment agreement includes the following "Duties of [the] Employee," and Section 2 states that "the Employee shall:"

(A)     Promptly and in good faith *comply with all directions*, requests, requirements, rules and regulations made by Employer in the conduct of its business.

(B)     Fulfill the duties of Senior Reporter and perform such services as Employer, in its exclusive discretion, shall designate with respect to broadcasts produced by Employer, which shall include, *but not be limited to*, appearances on Employer's scheduled broadcasts or other features, script preparation, performance or supervision of on-location taping, filming, or live broadcasting and personal tape or film editing or editorial supervision.. . . *Employer reserves the right to alter Employee's duties as it deems appropriate*.

*Id.* (emphasis added). Under the plain terms of the agreement, Sander was required to comply with all requests made by Gray Television; therefore, Sander's refusal to manage SnoGo and to produce web stories on February 21, 2008 was a violation of the terms of his agreement. While both tasks may have been outside his normal purview as a general assignments reporter, the agreement states

23

that Sander's duties were not "limited to" those listed in 2(B) and that Gray Television had the discretion to alter assignments as needed.

Sander tries to justify his refusal to manage SnoGo by saying that he "had never managed or even participated in SnoGo." Appellant Br. at 31; *see also* R.66, Sander Dep. at 159-160. However, this does not change the fact that Sander stated that he would not complete a task in a meeting, openly defying his direct supervisor. This action "very much undermine[d] the management of the newsroom." R. 65, Martin Dep. at 113. If Sander had genuine concerns about managing SnoGo or web producing that day, he could have expressed his thoughts in a way that would not have been construed as an act of open defiance. In addition, both tasks—web producing and managing SnoGo—were related to his position, and thus were within Gray Television's discretion to assign to Sander under Section 2(B) of his employment agreement. While Sander correctly states that he fully performed his job at Gray Television for 27 years, *id.* at 32 (citing R.72, Thomas Dep. at 80, 90-91), this does not change the fact that on February 21, 2008, Sander's actions constituted a breach of his contract.

Gray Television also had cause to terminate Sander for his insubordination, even though Gray Television ultimately accepted Sander's resignation and offered him severance. Martin explained that "[Sander's] years of service were worth [Martin] considering . . . severance," R. 65, Martin Dep. at 78, not that Gray Television did not have cause. Sander argues that whether Gray Television had cause to terminate Sander is "generally a question of fact for the jury to decide." Appellant Br. at 34. However, in this instance the contract is unambiguous.

Sander argues that the agreement does not define "willful default, neglect or misconduct," R.66-1, Employment Agreement, at 1 (Section 2(B)), and that "Gray Television has not demonstrated that Sander acted" with willful default, neglect, or misconduct. Appellant Br. at 35-36. However, the agreement has four other definitions of "Termination For Cause," two of which clearly apply in this case. Even if Gray Television cannot prove that Sander acted with willful neglect or misconduct, his refusal to manage SnoGo is a clear failure to comply with Section 2(A) and (B) of his employment agreement, which requires that he follow any "directions" and "fulfill the duties of a Senior Reporter" as determined by Gray Television. Therefore, by refusing to complete a task Sander did not comply with "the rules and policies established by [Gray Television]," R.66-1, Employment Agreement, at 4 (Section 10(A)(3)(emphasis added)), or "the terms of this Agreement." *Id.* at 4 (Section 10(A)(4)) (emphasis added).

As Sander did not fully perform the terms of the contract, and Gray Television had cause to terminate Sander, the district court correctly held that it was Sander, not Gray Television, who breached the employment agreement.

For these reasons, we affirm the district court's grant of summary judgment to Gray Television.

25

MERRITT, Circuit Judge, dissenting. The court finds as an undisputed fact precluding a jury trial that Sander quit his job and was not fired by WKYT general manager Martin and WKYT news director Thomas. But there is material, persuasive proof to the contrary that might well convince a jury that this "he-quit" defense was pretextual and a cover for management's decision to get rid of Sander for other reasons. The other reasons are not so clear, but there is material evidence that age may be the real reason or that Sander's impulsive outburst at the February 21, 2008 meeting, together with poor personal relations between Sander and Thomas, was the reason — or that some combination of these reasons contributed to the outcome. I would therefore send the case to trial. There are seriously conflicting inferences and material facts in dispute that should be further developed at trial. Though not as absolute as the right to a jury trial in the Sixth Amendment, the language and history of the Seventh Amendment and Rule 56 of the Federal Rules of Civil Procedure entitle the plaintiff to a full blown trial to resolve these factual issues regarding intent, pretext, and the sequence of events. The plaintiff might turn out to be a very sympathetic, credible witness, or maybe not. Such uncertainties should be left to the jury and not preempted by judges in the name of efficiency, saving time, or doubts about jurors.

1. Did Sander quit?

Contrary to our court's finding that plaintiff quit, news director Thomas specifically testified that he knew that Sander did not intend to quit: (Q. "And so it was clear to you that he [Sander] did not want to quit at the end of the conversation you had with him on Thursday? A. Yes."). Moreover, Martin told Sander on the phone before their meeting on Monday, February 25, "No, nothing like that" in response to Sander's question, "Have I lost my job?" So there is very strong

evidence that neither of Sander's two superiors, Thomas and Martin, believed contemporaneously that Sander had in fact quit. It was only later, after Thomas told Martin that Sander should be discharged, that the defendant TV station asserted as a defense that Sander had, in fact, "quit" and was not discharged. This defense came after Martin had talked to the station's lawyers. A jury might well believe that the voluntary resignation defense was simply a contrived pretext discussed with the lawyers and set up in order to avoid a claim that Sander was <u>discharged</u> — one of the elements necessary for an age discrimination claim. In light of the evidence in the case, it is clear to me that there is a material dispute of fact about whether Sander voluntarily resigned or was discharged.

2. Was Sander discharged because of his age?

There is also a material dispute of fact concerning age discrimination. If the jury believes that Sander did not quit but was discharged, then there is material evidence supporting a prima facie case of age discrimination. Sander was over 40 (his age was 62 at the time his employment terminated) and had worked for WKYT for 27 years. There is strong evidence that Sander was a well-respected "senior reporter" until Thomas became the news director not long before Sander's employment was terminated. Two months after Sander left in February 2008, Thomas, on behalf of the TV station, hired Tamara Evans, who was in her 20's. She did some of the work that Sander had been doing. Thomas testified that Evans became a general assignment reporter at WKYT, the same position that Sander held.

In addition, there is other evidence of age discrimination. Sander testified that Thomas frequently asked him when he was going to "retire" and called Sander "old-school," "old fashioned,"

and just plain "old." Sander's testimony in this respect was corroborated in part by Denny Trease in his deposition at pages 45-48. This evidence raises a question of material fact about whether Sander experienced age discrimination. The case should go to the jury on this issue. It should be up to the jury to decide on the inferences to be made from the facts and whether the assertion of the voluntary resignation defense, or Sander's February 21 outburst, was a smoke screen to hide Thomas' decision to discharge Sander because he was too "old" and too "old fashioned" to present a young and attractive face to the WKYT viewing public. The reason we have juries in civil and criminal cases is to resolve disputes based on conflicting inferences and disputes concerning intent. These are typical issues for juries in both civil and criminal cases.