United States Court of Appeals
Fifth Circuit

**F I L E D**

September 3, 2003

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

02-10844

JIMMY PALASOTA,

Plaintiff-Appellant,

VERSUS

HAGGAR CLOTHING CO.,

Defendant-Appellee,

Appeal from the United States District Court
for the Northern District of Texas

Before DAVIS, SMITH, and DUHÉ, Circuit Judges.

PER CURIAM:

The sole issue before us in this age discrimination in employment case is whether the district court erred in granting Judgment as a Matter of Law to Defendant, Haggar Clothing Co. ("Haggar") after the jury returned a verdict in favor of Plaintiff Jimmy Palasota ("Palasota"). Our review of the record convinces us that the district court did err. Accordingly, we reverse the judgment of the district court, reinstate the jury verdict in favor of Palasota and remand for further proceedings.

**FACTS AND PROCEDURAL HISTORY**

1

Palasota was employed as a Sales Associate by Haggar for twenty-eight years. When terminated on May 10, 1996, he was fifty-one years old. For most of his career, Palasota oversaw one of Haggar's key accounts, Dillard's Department Stores.[1] Palasota also serviced eight J.C. Penney's key accounts and various trade accounts. He was considered an "outstanding" employee who "had great relationships with customers" and "was second to none in his sales professionalism." R. 29:37, 43.

In the 1990s, Haggar's management sought to portray a younger image for the company. R. 30:147. Haggar created the Retail Marketing Associate ("RMA") program, and transferred many of the sales functions previously performed by Sales Associates to the RMA employees.[2] Indeed, ninety-five percent of the RMAs were females in their late twenties and early thirties, whereas ninety-five percent of the Sales Associates were males between forty-five and fifty-five years of age. R. 29:57.

---

[1] A key account is a high volume sales account that Haggar assigns only to its best Sales Associates. Unlike a high-volume key account, a trade account territory is made up of numerous lower-volume stores.

[2] The former head of the J.C. Penney account for Haggar testified that "there was no difference" between the Sales Associates and the RMAs; individuals in both positions "were being asked to sell clothing for the Haggar Clothing Company," and the transfer of the sales function "was a continuing plan" to move the Sales Associate's responsibilities to the RMAs, who "were all much younger, primarily female gender." R. 29:45; 32:471-72; 32:510. Roxanne Jilek, a former RMA, stated that RMAs assumed the sales duties of the Sales Associates, resulting in an elimination of the latter's position. R. 30:206-07.

**2**

From 1993 to 1996, Haggar hired between 32 and 51 sales people, all of them RMAs and all, but four, of whom were under forty years of age. R. 29:73-74. During this same period, Haggar terminated 17 Sales Associates, all of whom were males over forty years of age. Plaintiff Ex. 81-85. Between December 1, 1996, and March 31, 1998, Haggar terminated 12 Sales Associates forty years of age or older, including Palasota, while hiring 13 new RMAs, only one of whom was over forty years of age. Plaintiff Ex. 67, 68. Haggar's chief financial officer testified that the increase in the number of RMAs and the decrease in the number of Sales Associates were related and offset each other in the company's sales budget. R. 32:508-09.

In late 1995, Haggar lost its account with Dillard's which comprised approximately 85% of Palasota's commissions. National Sales Manager James Thompson created a new territory consisting of J.C. Penney stores in Houston, San Antonio, and Austin, that would have generated 85% to 90% of Palasota's 1995 commission amount. R. 30:169; 32:479. However, Thompson left Haggar in December of 1995. Palasota contends that Thompson's replacement, Alan Burks, and Vice President of Sales/Casual Tim Lyons, refused to grant him the territory proposed by Thompson, relegating him to less lucrative trade accounts in East Texas and Louisiana.[3] R. 31:325.

---

[3] Thompson testified that this territory was not appropriately matched to Palasota's background and experience level, R. 32:482 and that Palasota was the best candidate to assume the accounts of the J.C. Penney stores located in San Antonio, Houston, and Austin.

3

On February 23, 1996, Lyons told Palasota that he could accept the trade account territory or a severance package.[4] Supp 2:5; R. 31:300-01. Palasota declined the severance offer and refused to resign. On February 23, 1996, after the meeting, Lyons sent a memo to four other members of Haggar's management. After noting Palasota's 28 years of service and his refusal to accept the severance package, Lyons wrote that "we have approximately 14 associates with this same amount of tenure who are in their early fifties or older. I strongly recommend that Human Resources look at developing a severance package for these individuals. . . . This could provide us the ability to thin the ranks in a fashion that will create good will and ease the anxiety of this transition period . . . ." The memo concluded that "[t]he end result will be a sales organization that has its best people in a healthy account environment . . . ." Lyons Dep. Ex. 16. Of the 14 associates listed in the memo, all but two subsequently ended their employment with Haggar. Supp. R. 2:16.

In March of 1996, without denying that the additional J.C. Penney stores were available, Lyons informed Palasota that he would

---

R. 29:80; 32:482.

[4] In response to Palasota's concerns that the East Texas and Louisiana territory would yield smaller commissions, Lyons guaranteed Palasota, from January 1996 through may 1996, eighty percent of his 1995 salary of $175,000. R. 31:328, 330; Supp 2:48, 49. Haggar contends this decision insulated Palasota from its decision in the Fall of 1995 to pay its Sales Associates on straight commission, without a minimum guaranteed salary.

be terminated. R. 31:301-02. On April 29, 1996, Palasota was notified in writing that his position was being "eliminated" due to a "reconfiguration of the sales force." Plaintiff Ex. 9. Following Palasota's termination, other Sales Associates were given the J.C. Penney account that Thompson had slated for Palasota, and in 1997, these Sales Associates were terminated and replaced by younger RMAs. R. 29:91-92; 33:692; Supp. R. 2:13-14.

Haggar portrays Palasota's termination as an effective resignation, resulting from his dissatisfaction with the low commission yield of his new territory and the severance package offer. Haggar notes that Palasota never told management that he believed the company was treating him unfairly or that RMAs were taking over his position. Palasota's only complaint was that he wanted 28 months' severance, rather than the standard 12 months'. Haggar disputes Palasota's testimony that Thompson and other members of management[5] promised Palasota additional J.C. Penney stores in San Antonio, Austin, or Houston. Haggar contends that Vice President of Retail Merchandising Ray Pierce, with whom Palasota never spoke about the subject, retained sole authority to open J.C. Penney stores to Haggar's Sales Associates. R. 31:334.

Palasota produced further evidence that Haggar's management was concerned with the appearance of its aging sales force. In

---

[5] Besides Thompson, Palasota testified that in the Fall of 1995 he spoke to Douglas Moore, Tim Markham, and Joe Schlesinger about the possibility of adding J.C. Penney stores to his territory.

late 1995, Haggar's President, Frank Bracken, stated that he wanted "race horses" and not "plow horses," R. 32: 477, 512, while telling Palasota that he was out of the "old school" of selling. R. 32:478. Bracken announced at a sales meeting that there was a significant "graying of the sales force." R. 31:290, 405. Alan Burks, a member of management, stated at a sales executive meeting: "Hey, fellows, let's face it, we've got an ageing, graying sales force out there. Sales are bad, and we've got to figure out a way to get through it." R. 29:66.

After his termination, Palasota filed a charge of age and sex discrimination with the EEOC, which issued a determination finding cause on the age claim. At trial, a jury found Haggar liable under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, awarding Palasota $842,218.96 in backpay; the jury found no liability as to Palasota's Title VII claim.

Some months after the verdict, the district court granted Haggar's Motion for Judgment as a Matter of Law. The district court found that Palasota failed to demonstrate that Haggar had given preferential treatment to a younger employee and that evidence of treatment of other Sales Associates after Palasota left Haggar was not probative of whether age was a determinative factor in Palasota's discharge. Relying on a case predating *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000),[6] the court ruled that a reasonable jury could not conclude "without any inferences or presumptions" that age was a determinative factor in the company's termination decision. Further, the court found that all of the age-related comments made by Haggar's management were "stray remarks" and therefore not probative of discriminatory intent.

## ANALYSIS

We review the district court's grant of judgment as a matter of law de novo. *Raggs v. Miss. Power & Light Co.,* 278 F.3d 463, 467 (5th Cir. 2002). We must examine all the evidence in the record as a whole and draw all reasonable inferences in favor of Palasota. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 137, 151, 1205 S. Ct. 2097 (2000). We do not, however, assess credibility of witnesses or otherwise weigh the evidence. *Lytle v. Household Mfg. Inc.,* 494 U.S. 545, 554-55, 110 S. Ct. 1331 (1990).

Under the ADEA, it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "When a plaintiff alleges disparate treatment, liability depends on whether the protected trait (under the ADEA,

---

[6] *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296 (5th Cir. 2000), *cert. denied*, 531 U.S. 1145 (2001).

age) actually motivated the employer's decision."[7]  In other words, the plaintiff's age "must have actually played a role" in the employer's decision making process.  *Id.*

Where a case has been fully tried, it is unnecessary to "parse the evidence into discrete segments corresponding to the different stages" of the *McDonnell Douglas* framework.  *Scott v. Univ. of Mississippi*, 148 F.3d 493, 504 (5th Cir. 1998) (citation omitted).  Rather, the panel should examine whether the plaintiff has met his ultimate burden of proving that the employer terminated him because of age.[8]  *Id.*

Judgment as a Matter of Law should not be granted unless "the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion."  *Flowers v. S. Reg'l Physician Servs., Inc.*, 247 F.3d 229, 235 (5th Cir. 2001) (quotations and citations omitted).  The

---

[7] *Reeves, supra,* (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)) (internal quotation marks omitted).

[8] *See also United States Postal Serv. Bd. v. Aikens*, 460 U.S. 711, 713-14 (1983) ("Because this case was fully tried on the merits it is surprising to find the parties and the Court of Appeals still addressing the question whether *Aikens* made out a prima facie case.  We think that by framing the issue in these terms, they have unnecessarily evaded the ultimate question of discrimination *vel non*."); *Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 252 (5th Cir. 1996) ("When a case has been fully tried on the merits, the adequacy of the showing at any stage of the *McDonnell Douglas* framework is unimportant; rather, the reviewing court must determine whether there was sufficient evidence from which a reasonable trier of fact could have concluded that age discrimination occurred.").

**8**

panel must "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151; *see also* FED. R. CIV. P. 50(a)(1).

Our reading of the record and the district court's opinions convinces us that it erred by: (1) holding that Palasota was required to show that a younger employee was given preferential treatment; (2) ignoring much evidence which supports the jury's verdict, including the February 23, 1996 memo; and (3) discounting the probative value of management's remarks, despite Palasota's establishment of a *prima facie* case. Under *Reeves*, Palasota's establishment of a *prima facie* case combined with doubt cast on Haggar's proffered supposed non-discriminatory explanation for termination§§that Palasota voluntarily resigned§§are sufficient to support liability. 530 U.S. at 147.

In earlier denying Haggar's Motion for Summary Judgment, the district court correctly found that Palasota established a *prima facie* case: (1) he was discharged; (2) he qualified for the position; (3) he was a member of a protected class; and (4) there was a material issue of fact as to whether he was discharged because of his age. Order of September 24, 2001, p. 6-8. On appeal, Haggar does not argue that Palasota failed to establish a *prima facie* case, nor, as discussed below, does it defend the district court's mistaken observation that Palasota was required to demonstrate preferential treatment of a younger employee. Instead,

**9**

Haggar argues that Palasota's stated dissatisfaction with the loss of his Dillard's account and request for severance prove that he voluntarily resigned. Yet, the April 26, 1996, termination letter states that Palasota's "position has been eliminated" as a means of "re-configuring the sales staff." Plaintiff's Ex. 9. Haggar explains this inconsistency by contending that termination language was necessary for Palasota to receive extended medical benefits and severance pay.[9] However, given the plain language of the termination letter, Palasota's previous rejection of Haggar's severance offer, and Haggar's refusal to link the loss of the Dillard's account to an overall down-sizing in its sales staff (the only other plausible non-discriminatory explanation for Palasota's termination), a reasonable jury could have "infer[red] from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves*, 530 U.S. at 147.[10]

The court also erred by holding that Palasota had to show that Haggar had given preferential treatment to a younger employee under "nearly identical" circumstances. Without discussing evidence

---

[9] Haggar contends that its insurance company required this designation for employees who sought extended benefits. Haggar also contends that it was necessary to include this language in the termination letter "so that Palasota could receive severance pay under what Lyons believed was Haggar's company policy." The jury was entitled to disbelieve this explanation for want of credibility.

[10] *See also Nichols v. Lewis Grocer*, 138 F.3d 563, 568 (5th Cir. 1998) (noting that "a reasonable juror certainly may infer discrimination when an employer offers inconsistent explanations for the challenged employment action").

favorable to Palasota, the court summarily concluded that his theory of the caseSSthat Haggar sought to replace its largely older, male sales force with a younger female sales forceSSwas insufficient to prove disparate treatment. The court stated that Palasota's "attempted comparison with the RMAs, general and conclusory as it was, does not" show preferential treatment under "nearly identical circumstances." Memorandum Order June 26, 2002, at 12.

Treating younger workers more favorably is not the only way to prove age discrimination. A plaintiff must show that "(1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) *otherwise discharged because of his age.*" *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 957 (5th Cir. 1993) (emphasis added). Accepting Haggar's characterization of this dispute as a reduction-in-force case, the plaintiff need only show "evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue." *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996) (quoting *Amburgey v. Corhart Refractories Corp.*, 936 F.2d 805, 812 (5th Cir. 1991)).[11] Therefore, Palasota was not required to

---

[11] In *Amburgey*, this court further noted that, in reduction-in-force cases, the plaintiff must "produce some evidence that an employer has not treated age neutrally. . . . Specifically the

demonstrate that the Sales Associates and RMAs were given preferential treatment or that he was immediately replaced by an RMA.

The district court observed that, though replacement by a younger worker was not a necessary component of Palasota's *prima facie* case, Palasota still "[a]t the end of the day . . . has to compare himself to a younger worker under 'nearly identical' circumstances to show that he was treated 'disparately' because of his age." Memorandum Order supra at 12 n.3. This runs counter to *Reeves*, which holds that the establishment of a *prima facie* case and evidence casting doubt on the veracity of the employer's explanation is sufficient to find liability. 530 U.S. at 147.

Palasota produced evidence which the district court did not address from which a reasonable juror could conclude that he was terminated as part of Haggar's plan to turn Sales Associate duties over to younger RMAs. For example, it did not address the February 23, 1996, memorandum from Tim Lyons to Haggar executives Frank Bracken, Joe Haggar, III, and Alan Burks. In that memo, Lyons discusses Palasota's displeasure with the company's offer of a standard severance package. Lyons then shifts focus, recommending severance packages for fourteen named Sales Associates, all of whom

---

evidence must lead the factfinder reasonably to conclude either (1) that defendant consciously refused to consider retaining or relocating a plaintiff because of his age, or (2) that defendant regarded age as a negative factor in such consideration." 936 F.2d at 812 (citation omitted).

**12**

are specifically identified as over fifty years of age, in order to "thin the ranks" as part of a transition period. The memo states that, by eliminating employees over fifty years of age, "we will have the flexibility to bring on some new players that can help us achieve our growth plans."

To qualify as direct evidence, a document must be (1) age related, (2) proximate in time to the termination, (3) made by an individual with authority over the termination, and (4) related to the employment decision. *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996). The memo, which is undeniably age-related, was composed approximately two months before Palasota's termination. Lyons, Vice President of Sales/Casual, was empowered to terminate Palasota, as well as offer severance packages to other employees. In no uncertain terms, the memo discusses a broad plan to "thin the ranks" of older Sales Associates in order to "ease the anxiety of this transition period."

Haggar contends the memo merely discusses the possibility of providing severance packages to three employees requesting them, including Palasota. This ignores the fact that 14 employees over fifty years of age, at least 11 of whom did not request severance packages, were targeted for offers. Haggar does not explain why, as part of its plan to "reconfigure" its sales staff, only older associates were selected, nor why RMAs were simultaneously hired to perform sales duties.

13

Though the offer of a severance package is not, by itself, evidence of age discrimination, *Bodnar v. Synpol, Inc.*, 843 F.2d 190, 192-93 (5th Cir. 1988), *cert. denied*, 488 U.S. 908 (1988), such offers assume that employees "may decline the [early retirement] offer and keep working under lawful conditions." *Id.* (quoting *Henn v. Nat'l Geographic Soc'y*, 819 F.2d 824, 826 (7th Cir. 1987)). Within two months after Palasota refused to accept the severance package, he was "eliminated"; the stated reason for termination was a "reconfiguration of the sales force." Plaintiff's Ex. 9. Between December 1, 1996, and March 31, 1998, Haggar terminated twelve Sales Associates, including Palasota.[12] Plaintiff's Ex. 67, 68. Within one year after Palasota's termination, the Sales Associates assigned to the J.C. Penney's account were terminated and replaced by RMAs. R. 29:91-92; 33:692; Supp 2:13-14. Ninety-five percent of the Sales Associates were males over the age forty, while ninety-five percent of the RMAs were females under forty. Haggar's chief financial officer testified that increases in the number of RMAs and declines in Sales Associates were designed to offset one another. R. 32:508-09. The former head of Haggar's J.C. Penney account testified that

---

[12] The record shows that three other Sales Associates ended their employment on the same day as Palasota. R. 30:163; Plaintiff Ex. 81. Nine of the other fourteen Sales Associates over fifty years of age were either laid off, or otherwise terminated their employment, over the next five years. Plaintiff Ex. 67; Plaintiff Ex. 81.

**14**

"there was no difference" between the RMAs and Sales Associates, and that the transition was part of a plan to shift sales responsibilities to the younger, predominantly female, RMAs. R. 29:45; 32:471-72; 32:510. Coupled with Haggar's mid-1990s campaign to present a more youthful image, a reasonable juror could conclude that Palasota was terminated because of his age.[13]

The district court also erred by discounting age-related remarks attributed to National Sales Manager Alan Burks and President Frank Bracken as "stray remarks." Relying on *Wyvill*, a pre-*Reeves* decision, the court found the remarks insufficient to create an inference of discriminatory intent. *Wyvill* stated that, for an age-based comment to be probative of an employer's discriminatory intent, it must be "direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that age was a determinative factor in the decision to terminate the employee." 212 F.3d at 304. After *Reeves*, however, so long as remarks are not the only evidence of pretext, they are probative of discriminatory intent.[14]

---

[13] The district court also ignored the EEOC's determination of reasonable cause, made after a two and one-half year investigation, to believe that Palasota and similarly situated Sales Associates were discharged in violation of the ADEA. "[A]n EEOC determination prepared by professional investigators on behalf of an impartial agency, [is] highly probative." *Plummer v. Western Int'l Hotels Co.*, 656 F.2d 502, 505 (9th Cir. 1981) (citing *Peters v. Jefferson Chem. Co.*, 516 F.2d 447, 450-51 (5th Cir. 1975)).

[14] See *Russell*, 235 F.3d at 229 n.19 ("*Rubinstein* stands only for the proposition that an overwhelming case that the adverse

**15**

Haggar argues that Bracken's comment that Haggar needs race horses, not plow horses, is not probative because "[r]acehorses and plowhorses can be young or old." Similarly, the company argues that Bracken's comment that Palasota's sales techniques were out of the "old school" of selling relates to traditional practices, not age. As to Bracken's sales meeting comment that there was a "graying of the sales force" and Burks's statement that "we've got to find a way to get through it," Haggar contends these are objective observations, ambiguous, and insufficient to infer discrimination; the statements were also unconnected in time to Palasota's termination.

Post-*Reeves*, this court has taken a more "cautious" view of the stray remark doctrine discussed in *Wyvill*. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 229 (5th Cir. 2000).[15] Age-related remarks "are appropriately taken into account when analyzing the evidence supporting the jury's verdict," even where the comment is

---

employment actions at issue were attributable to a legitimate, nondiscriminatory reason will not be defeated by remarks that have no link whatsoever to any potentially relevant time frame."); *see also Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 403 n.7 (5th Cir. 2001) (refusing to consider stray remarks as circumstantial evidence of age discrimination where no other evidence of pretext); *Rubinstein v. Adm'rs of Tulane*, 218 F.3d 392, 401 (5th Cir. 2000), *cert. denied*, 532 U.S. 937 (2001).

[15] Even before the Court decided *Reeves*, this court noted that "the 'stray remark' jurisprudence is itself inconsistent with the deference appellate courts traditionally allow juries regarding their view of the evidence presented and so should be narrowly cabined." *Vance v. Union Planters Corp.*, 209 F.3d 438, 442 n.4 (5th Cir. 2000).

not in the direct context of the termination and even if uttered by one other than the formal decision maker, provided that the individual is in a position to influence the decision. *Id.* Bracken and Burks, both members of upper management, were in such a position. The jury was entitled to believe Palasota's theory that older Sales Associates were pushed out in favor of younger RMAs as part of a plan to bring a more youthful appearance to Haggar. Alongside Palasota's establishment of a *prima facie* case and a fact issue as to the veracity of Haggar's stated grounds for termination, Bracken's and Burks's remarks were probative of discriminatory intent.

In granting the Judgment as a Matter of Law, the district court was not required to and did not reach the questions whether the evidence supported the jury's finding of willful discrimination and the award of back pay. Therefore we do not reach those issues.


### CONCLUSION

The district court erred in granting Judgment as a Matter of Law. The judgment of the district court is reversed, the verdict of the jury is reinstated, and the case is remanded to the district court.

REVERSED, JURY VERDICT REINSTATED, REMANDED.

**17**