NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0464n.06

No. 14-2538

**FILED**
Aug 11, 2016
DEBORAH S. HUNT, Clerk

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

DIANNA JACKSON, )
)
    Plaintiff- Appellant, )
)
v. )
) ON APPEAL FROM THE UNITED
) STATES DISTRICT COURT FOR THE
TRINITY HEALTH-MICHIGAN, ) EASTERN DISTRICT OF MICHIGAN
)
    Defendant- Appellee. )
)
)

BEFORE:     DAUGHTREY, MOORE, and SUTTON, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. Officials at Trinity Health-Michigan (Trinity), a national, not-for-profit health system, fired plaintiff Dianna Jackson from her position as director both of the radiology department and of a sleep disorder clinic at St. Joseph Mercy Oakland Hospital in Pontiac, Michigan. Trinity contends that it terminated Jackson's employment because of issues with her leadership and her performance. Jackson insists, however, that invidious race and age discrimination were the true reasons behind the adverse employment decision. Thus, she filed suit against Trinity, alleging: (1) racial discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2000e-17; (2) racial discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws §§ 37.2101–2804; (3) retaliation in violation of the Elliott-Larsen Civil Rights Act; and (4) age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634.

The district court ultimately granted summary judgment to Trinity and dismissed Jackson's complaint with prejudice. Jackson now contends that the district court's decision was erroneous because the record before the court established that she had adduced sufficient evidence to create a genuine dispute of fact that should have been resolved by a jury. We disagree and affirm, although we do so for reasons different from those offered by the district court in its summary-judgment ruling.

## FACTUAL AND PROCEDURAL BACKGROUND

In November 2007, Dianna Jackson, then a 58-year-old African-American woman, began work at St. Joseph Mercy Oakland Hospital as the interim director of radiology. Two months later, on January 13, 2008, after John Osborne, the previous director, was fired from his position, Jackson was tabbed to replace the younger, Caucasian male as the full-time director. In that role, Jackson reported directly to the hospital's vice-president of operations, Denise Brooks-Williams, herself an African-American woman. Two departmental managers—Erika Page, a Caucasian woman who managed general radiology within the hospital, and Colleen Burns (later known as Colleen Ealy), a Caucasian woman who managed the outpatient breast imaging at sites away from the hospital—reported directly to Jackson.

Shortly after Jackson assumed the role of department director, Page and Ealy came to her and related that Osborne, prior to his departure from hospital employment, had told the two managers that Jackson "was going to terminate them because [she] was black and they were white." According to Jackson, Ealy and Page approached her at that time only because they trusted Jackson not to act as Osborne had predicted she would. Nevertheless, Jackson later claimed in her deposition testimony that Osborne's alleged comments to Ealy and Page poisoned the relationship among the three women because "that established the issue with race from the

very beginning because that let them know right then that, oh, my goodness, she's black and we're white and because of that, she is going to fire me."

Jackson insisted that she enjoyed good working relationships with her superior and with her subordinates prior to Denise Brooks-Williams's promotion to chief executive officer of another hospital within the Trinity system in March 2009. In support of that contention, Jackson highlighted the fact that Brooks-Williams's evaluation of her from the date of her hire in November 2007 through June 30, 2008, was positive, lauded Jackson's leadership and accessibility to her staff, and noted Jackson's open and honest communications with other hospital employees. Brooks-Williams, however, explained in her deposition:

> [Jackson's positive evaluation] was relative to prior relationships. Jack Osborn[e] was not, towards the end of his tenure, a strong communicator. He really kind of retreated as a result of some of the feedback and performance challenges that he had, so Dianna did come into the organization very positively received. She's got high energy, you know, so that was in contrast to the leader that she was replacing. She was seen as refreshing in that regard, available to people. I mean, if someone is in their office all the time and disengaged and a new person that comes and is out talking to people and getting to know people, that was received well.

Jackson's next evaluation, after the close of the July 2008–June 2009 fiscal year, was not as positive in its tone. By that time, Brooks-Williams had left the hospital and had been replaced as vice-president of operations by Shannon Striebich, a Caucasian female. However, because Striebich did not succeed Brooks-Williams until April 2009, she consulted with her predecessor prior to issuing Jackson's second evaluation. Brooks-Williams noted the appropriateness of such consultation and explained that Striebich attempted to give Jackson "the most balanced review and not just take the recent period out of context from what [Brooks-Williams] would have observed when [she] was there." After discussing with Striebich Jackson's performance over the months during which Brooks-Williams supervised her, the former vice-president concurred with

Striebich's concerns regarding Jackson's leadership and communications skills. In the end, Striebich's evaluation of Jackson included assignment of a score of 2.88 out of a possible 4.00, a score that Striebich described as "low compared to where one would expect a director to score." Specifically, although praising Jackson's communications with patients and their families and her active role in seeking to better relationships with medical staff, Striebich noted in her evaluation that Jackson needed to balance her natural inclination to work independently with the need to "partner with departments across the organization to maximize effectiveness of the Radiology department," and to temper her "direct style of communication" when necessary "to ensure continued contributions from her team."

The concerns about Jackson's management style expressed in that first full-year evaluation proved prescient as, almost immediately after the issuance of the evaluation, the working relationship between Jackson and her managers, Colleen Ealy and Erika Page, crumbled amid allegations of a dictatorial management style and a lack of communication. Indeed, even before Brooks-Williams left St. Joseph Mercy Oakland Hospital, Ealy and Page complained to her about communication conflicts with Jackson. Then, both in June 2009 and September 2009, Striebich began receiving complaints from front-line staff, from managers, and from physicians about Jackson's "leadership style and her interactions with others and her commanding control styles. She was described as a dictator, she was described as harassing, but then there were also issues in the department" involving poor turnaround times and even improper radiation dosing of patients.

For example, during a managers' meeting in September 2009, Jackson berated Page in front of Ealy for not showing Jackson an article Page had written for an in-house publication, even though Page previously had been directed to give the article only to Striebich for review.

According to Page, Jackson "was aggressive, confrontational and made every attempt at intimidating me." That same day, Page complained about Jackson to Ane McNeil, who then was the hospital's manager of human resources. According to McNeil:

> Page told me that Dianna Jackson was not effective and that she and Colleen Ealy perform the actual work of the Department. Ms. Page stated that Ms. Jackson frequently "jumped to conclusions," provided no communication or mentoring, and intimidated and threatened employees with loss of their jobs. Ms. Page stated that she, Ms. Ealy and Shelly Duenas, a nurse in the Department, were all considering quitting rather than work with Ms. Jackson.

Ealy echoed many of those same sentiments, meeting with Striebich to complain about Jackson's leadership, or lack thereof. Ealy recounted that, at that time, "there was so much tension in the department[;] we were not functioning. We – we needed to get back on track. There was just – there was no communication. It was just chaos in the department." Ealy stated further that the chaos within the radiology department not only resulted in complaints from physicians, but also affected the general operation of the department, as well as patient service. Nevertheless, Jackson took no steps to resolve issues between managers, visited Ealy's outpatient facility only once during the plaintiff's entire tenure at the hospital, routinely spent time on classwork for an advanced degree during work hours, and rarely attended or stayed at department meetings. Ealy also claimed that Jackson criticized Page continually, treating her so harshly that Ealy felt obligated to email Page to apologize for Jackson's behavior, even though Ealy and Page had their own turbulent relationship.

Because of Ealy and Page's complaints, Striebich and McNeil arranged to meet on November 24, 2009, with Jackson, Ealy, and Page "to talk about the differences that had been presented . . ., interpersonal conflicts between [sic] the three of them, the trust issues, et cetera." The same participants attended a follow-up meeting on December 3, 2009, and "review[ed]

5

expectations and intentions that each of them had for working together and moving forward."

Striebich recalled:

> This was a supportive coaching type of a meeting, and one of the things that [Jackson, Ealy, and Page] pledged was that they wanted to have open and honest and transparent communication and to trust one another.
> And the first thing that Dianna did at the end of that meeting was hold Ane and I [sic] back to share with us concerns that she had heard from another associate, David Patton.
> The first question Ane and I asked was whether Dianna had approached Erika with those concerns, and her response was no; and that was concerning to me because we had just finished a very long dialogue about open and honest and transparent communication and assuming goodness of intentions and all of those types of things.

Thus, despite the efforts of Striebich and McNeil, little changed in the manner in which Jackson dealt with Ealy and Page. In fact, before the end of 2009, another incident sparked a confrontation between Jackson and Page. According to Page's deposition testimony, a hospital x-ray technician, Rosa LaFountain, had inquired whether she could have a hospital computer that had been designated for disposal. Page consulted with a hospital IT employee who indicated that LaFountain could have any of the computers in the storage area "because they were going in the garbage anyway." Because Page had been told that any personal health information entered into the surplus computers had been wiped clean, she claimed that she "followed the proper procedure" in allowing the equipment to be taken from the hospital.

Jackson learned about the release of the surplus computer on December 22, 2009. Rather than ascertain immediately whether all patient health information had been erased from the equipment and whether Page indeed had followed proper procedures in allowing LaFountain to take a computer home, Jackson waited until January 5, 2010, before emailing Striebich about the situation. Even at that time, Jackson emphasized that Page had not consulted her initially about the matter and that, as a result, Page should be fired. Focused as she was on disciplining Page,

6

Jackson failed to bring the incident to the attention of the hospital's privacy officer or the hospital's director of information services. By contrast, when Striebich finally was informed of the situation, "the first place that [she] went to was, 'Oh, my gosh, is there [personal health information] on those computers? Are we sure that there isn't?'" By instituting a thorough investigation into the matter, Striebich and Martha Murphy, the vice-president of human resources, were able to ascertain within 24 hours that no personal health information was contained on any computers that left the hospital and that Page, in fact, "had followed all the appropriate procedures" in releasing the surplus equipment. Consequently, Striebich imposed no discipline on Page related to the computer incident, but did voice "significant concerns with how [Jackson] managed this incident with the computers."

Unfortunately, the additional problems Jackson experienced with the managers in her department were not limited to the surplus-computer issue. In April 2010, Ealy took an extended medical leave of absence, during which Jackson asked Page to visit Ealy's outpatient facilities on a weekly basis, to report on any problems she observed, and to suggest methods for improving the provision of services. However, Jackson never accompanied Page on the weekly rounds or informed Ealy's staff why Page was examining and documenting their operations. As a result, the staff viewed Page with suspicion, took offense at her attempts to gather information, and even reported to Ealy that Page was "trashing" her.

Upon her return to work, Ealy reported Page's perceived interference with Ealy's staff's operations, but Jackson was unsuccessful in her attempt to defuse the situation. As Striebich later explained:

> That's kind of another example of Dianna not thinking critically through a situation, leaping to a conclusion that was wrong. You don't talk about firing somebody that's out on a medical leave having two knees replaced.

7

> If there are operational deficiencies that are identified, you would expect a director to provide leadership to remedy those deficiencies and to then use, again, critical thinking and sound judgment to address the person when they return from their leave, to get their side of the story.

Nor was the lack of leadership and sound judgment in that situation the full extent of Striebich's frustration with how Jackson dealt with Ealy and Page. Striebich recounted:

> [W]e go from January of that year, Dianna articulating that she wants Erika fired [over the computer issue], and in April of that year, she wants Colleen fired, and she articulates that she wants – she's already identified who Colleen's replacement ought to be.
>
> Colleen comes back from her medical leave and the situation turns again on its head, and Dianna takes no accountability for supporting the remedy of these operational issues at the off-sites.
>
> I sit in a meeting with Colleen and Dianna, and Colleen starts articulating her concerns about the fact that Erika, she used the word, trashed her while she was on medical leave, and Dianna did not step in and say, "I asked Erika to visit your off-sites and I asked her to fix those operational issues."

When Jackson later approached Striebich with concerns about payroll decisions made by Page, much to Striebich's dismay, Jackson noted that she already had discussed the problem with the payroll records department, even before trying to resolve the issues by talking with Page directly. Striebich thus instructed Jackson first "to have a conversation with Erika, state what her observations have been, why she's concerned, and get some feedback from Erika." Rather than following those suggestions, however, Jackson confronted Page a week later, called her into her office, and presented Page with a three-page, nine-question document and directed her to explain payroll decisions made as long as 13 months earlier. Although Page requested "an opportunity to go back and look, pull any exception sheets from payroll," Jackson insisted that Page answer the inquiries in writing immediately. Even when Page asked Jackson for clarification on some of the items, Jackson responded by telling Page repeatedly "to write her responses down." Later,

Jackson admitted to Striebich "that the approach she took probably was not the best," especially in light of the fact that a payroll manager subsequently found no discrepancies in the records.

The fallout from Jackson's dealings with Page over the alleged payroll discrepancies led Striebich to speak with Jackson on September 3, 2010, for one-and-one-half hours, reviewing various examples of Jackson's mismanagement. Specifically, Striebich referenced the surplused-computer incident in January 2010, Jackson's failure to explain Page's role during Ealy's medical leave, the payroll issue, and the general feeling that the radiology department lacked strong leadership. At the end of the meeting, Striebich expressed her frustration, claiming that she was "out of ideas" on how to improve Jackson's interactions with her subordinates and with other departments in the hospital. As a last resort, she directed Jackson to "pull together a plan for how she intends to address this within the next 2 weeks," and suggested that Jackson meet with Toni Flowers-Jefferson, then the hospital's chief diversity and inclusion officer.

Rather than provide the requested plan for improvement, however, Jackson went on her own medical leave of absence from September 13, 2010, through November 1, 2010. Even upon her return to work, Jackson did not provide Striebich with information on how she planned to improve her communication and management skills. Indeed, as of November 23, 2010, Jackson still had not sent Striebich the requested plan.

On November 29, 2010, while still waiting for Jackson to comply with the directive given her, Striebich was approached two radiologists with privileges at St. Joseph Mercy Oakland Hospital. The two physicians expressed their lack of confidence in Jackson, indicating that "things were better when she was not at work" and that "she added no value." They further stated to Striebich that they felt Jackson was incompetent and that "they don't bother going to

her with problems because she doesn't know how to respond appropriately or work to resolve them."

In light of those comments and the history of conflicts between Jackson and her subordinates, Striebich and Murphy decided to terminate the plaintiff's employment with the hospital effective January 7, 2011. (Page ID 4; 1091) According to Murphy:

> [T]he management team had broken down and . . . the leader of the entire department is the one accountable for making sure that those breakdowns don't happen.
>
> So as it pertained to the question of Dianna's performance, I believed that Dianna did not manage her team or build those relationships appropriately . . . . And as a result . . . there was conflict and bickering not only between Dianna and Erika, Erika and Colleen; really, all of the employees were witness to a dysfunction that Dianna was ultimately accountable for.

In reaching the termination decision, Striebich and Murphy considered that they had coached Jackson for two years on how better to deal with issues that might arise and how to treat employees with more respect, yet the plaintiff's "department was in pretty severe disarray," "[m]orale was very bad," and "operations were not running the way they needed to." Specifically, Striebich and Murphy focused on the facts that Jackson's "leadership style was referred to as harassing, dictator-like, mean" and that the leadership team did not function well together. Striebich also noted that Jackson failed to utilize critical-thinking skills in dealing with the computer situation and by stating in front of Page that she wanted to fire Ealy. In addition, Jackson failed to defuse the conflict between Page and Ealy over Page's review of Ealy's department by explaining that it was Jackson, not Page, who was responsible for Page examining the functioning of Ealy's operations while Ealy was on a medical leave of absence.

Despite the evidence compiled by hospital administrators that Jackson was terminated for legitimate business reasons, Jackson asserted that race and age discrimination were the true

reasons for the adverse employment decision. Consequently, she filed this lawsuit in federal district court, raising claims of race discrimination under Title VII and Michigan's Elliott-Larsen Civil Rights Act, retaliation under Michigan law, and age discrimination under the Age Discrimination in Employment Act. Following extensive discovery by both parties, Trinity filed for summary judgment in its favor, a motion that the district court granted. In doing so, the district court concluded that Jackson had not identified a similarly situated individual who was treated more favorably than she was and, therefore, that she had failed to establish a *prima facie* case of discrimination. The district court also noted that Jackson had not offered any direct evidence of age discrimination and had failed to respond to Trinity's assertion that she had not alleged that she had engaged in any protected activity that could support her retaliation claim. From that decision that resulted in the dismissal of her complaint, Jackson now appeals.

## DISCUSSION

We review a district court's grant of summary judgment *de novo*. *Dodd v. Donahoe*, 715 F.3d 151, 155 (6th Cir. 2013). Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists only when, assuming the truth of the non-moving party's evidence and construing all inferences from that evidence in the light most favorable to the non-moving party, there is sufficient evidence for a trier of fact to find for that party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). A non-moving party cannot withstand summary judgment, however, by introduction of a "mere scintilla" of evidence in its favor. *Id.*

**Claims of Retaliation and Age Discrimination**

At the outset, we easily can dispense with two claims made by Jackson in her complaint. First, she has waived her claim that Trinity terminated her in retaliation for her assertions of race discrimination. As the district court noted in its summary-judgment ruling, Jackson offered no response to Trinity's motion to dismiss the retaliation cause of action for failure to allege a protected activity. Furthermore, Jackson's appellate brief makes no mention whatever of the retaliation claim. It is well established that "failure to raise an argument in [an] appellate brief constitutes a waiver of the argument on appeal." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 311 (6th Cir. 2005).

Similarly, Jackson's claim of age discrimination is patently without merit. Although a claim of age discrimination may be proven either by direct or by circumstantial evidence, *see Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003), Jackson relies only upon alleged direct evidence in this case. "Direct evidence of discrimination is 'that evidence which, if believed, *requires* the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Id.* (emphasis added) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)).

Jackson, in her effort to establish such direct evidence of age discrimination, points us to the following deposition colloquy between her own counsel and Martha Murphy, one of the individuals involved in the termination decision:

> Q.  Are you saying that Ms. Jackson was thought of as being a top down dictatorial leader?
> A.  Yes.
> Q.  And that was old school, in your mind?
> A.  You might call it that.

Jackson argues that the phrase "old school" negatively references her age and that Murphy's acquiescence to the suggestion that she thought, in her mind, that Jackson's style of leadership was "old school" established Murphy's intent to consider Jackson's age as a factor in the termination decision.

To support that assertion, Jackson cites an unpublished decision by this court and a published opinion by the Court of Appeals for the Fifth Circuit. The citation to *Sander v. Gray Television Group, Inc.*, 478 F. App'x 256 (6th Cir. 2012), is not helpful for multiple reasons. First, *Sander* is an unpublished opinion and, as such, has no precedential value and is not binding on later panels. *See Tanner v. Yukins*, 776 F.3d 434, 441 (6th Cir. 2015) (unpublished opinions lack any precedential value outside of the cases in which they were issued). Furthermore, even in *Sander*, it was the plaintiff himself, not a leadership style, that was described as "old" or "old school." *Sander*, 478 F. App'x at 266. Also, it was Sander's direct supervisor, not his own counsel, who referenced the objectionable phraseology. Finally, we concluded in *Sander* that "[t]o the extent that these comments were isolated and ambiguous, this court has held that these types of remarks are too abstract . . . to support a finding of age discrimination." *Id.* (internal quotation marks and citation omitted).

Likewise, the Fifth Circuit's non-binding decision in *Palasota v. Haggar Clothing Co.*, 342 F.3d 569 (5th Cir. 2003), does not persuade us to rule in Jackson's favor on her age discrimination claim. *Palasota* involved a situation markedly different from that in this case. Although, as here, the plaintiff in *Palasota* was not himself referred to as "old school," other comments by decision-makers in that case, *in conjunction with the "old school" reference*, justified a finding of age discrimination. As the Fifth Circuit detailed:

> In late 1995, Haggar's President, Frank Bracken, stated that he wanted "race horses" and not "plow horses," while telling Palasota that he was out of the "old

school" of selling. Bracken announced at a sales meeting that there was a significant "graying of the sales force." Alan Burks, a member of management, stated at a sales executive meeting: "Hey, fellows, let's face it, we've got an ageing, graying sales force out there. Sales are bad, and we've got to figure out a way to get through it."

*Id.* at 573 (citations to the record omitted). Thus, the numerous, pointed comments made in *Palasota* are more indicative of age discrimination than is the single abstract comment offered in this case *by Jackson's attorney*, not by any employee or decision-maker at St. Joseph Mercy Oakland Hospital. Neither *Sander* nor *Palasota* thus offers support for Jackson's age-discrimination claim.

**Race-Discrimination Claim**

Jackson also argues that Trinity's termination decision reflected improper racial discrimination forbidden both by Title VII of the Civil Rights Act of 1964, as amended, and by the Elliott-Larsen Civil Rights Act. In pertinent part, Title VII makes it unlawful for an employer "to discharge any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Similarly, the Elliott-Larsen Civil Rights Act forbids an employer from "discharg[ing] . . . an individual . . . because of . . . race." Mich. Comp. Laws § 37.2202(1)(a). As noted previously, a plaintiff in an employment-discrimination case may establish her claim "either by introducing direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

**Direct Evidence of Racial Discrimination**

Jackson has failed to allege any direct evidence of race-based discrimination. Although she admits that only Erika Page and Shannon Striebich discriminated against her based on race, Jackson could not recall any racially discriminatory statements ever made by Striebich, and the

only allegedly discriminatory comment attributed to Page could not be considered evidence of racial prejudice by any rational finder-of-fact. Jackson described the supposedly offensive statement by Page as follows:

> And I think [Page] had a real problem with race because she made a statement to me once that she had a black member in her family, and that so she therefore, and I don't know why she brought this up, and I can't remember the context of the conversation, but she had a black member in her family, and that so she had no prejudice or any other problems with anybody that was black, but normally when someone brings up something like that, you're like, you know, my neighbor is black or my best friend is black or whatever the case may be, usually there is an issue. So I can't remember what the context was. I can't remember the whole conversation, but I remember that part.

Fortunately, to provide the appropriate context for the statement, Page did remember the conversation with Jackson during which Page's family history was discussed. In her deposition testimony, Page explained that her father has a blood relative of African descent who has lived in the Netherlands "for a long time" and then stated:

> I'm an elite singer of a Christian rock and blues band. Another associate, Mickey, well, Bicentennial Long, that is the name, he was very interested, he wanted to hear our music. So I brought in a rough recording of our practice . . . and he placed it in his laptop and listened to it. And Dianna was walking down the hall where his office was. He asked her to come in and listen, and she listened and enjoyed it and asked me, "How does a white girl got [sic] such a bluesy voice?" to which I just responded, "Well, my dad says it is because we have African blood, too." At which point we chuckled and that was it.

Far from providing direct evidence of racial discrimination, Page's comment that she is related by blood to an individual of African heritage was a relatively innocuous comment in response to a racially-stereotyped comment made *by Jackson herself*.

### Circumstantial Evidence of Racial Discrimination

In the absence of any direct evidence of racial discrimination, Jackson next seeks to prove unlawful discrimination by circumstantial evidence. In doing so, she avails herself of the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973),

and refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), a framework applicable both in Title VII cases and in cases brought pursuant to the Elliott-Larsen Civil Rights Act. *See Sniecinski v. Blue Cross & Blue Shield of Mich.*, 666 N.W.2d 186, 193 (Mich. 2003). Under that paradigm, a plaintiff first must establish a *prima facie* case of discrimination. *Burdine*, 450 U.S. at 252-53 (citing *McDonnell Douglas*, 411 U.S. at 802). If the plaintiff can do so, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the [alleged adverse action.]" *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). The plaintiff then is required to prove that the reasons proffered by the defendant were not the true motivations for the defendant's actions, but were mere pretexts for prohibited discrimination. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804).

We have held repeatedly that a plaintiff's burden of establishing a *prima facie* case is not an onerous one, *see, e.g.*, *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000) (citing *Burdine*, 450 U.S. at 253), and is "a burden easily met." *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987) (citations omitted). As we explained in *Laster*:

> To establish a *prima facie* case of discrimination under both Title VII and the Elliot[t]-Larsen Civil Rights Act, Plaintiff must show that 1) [s]he is a member of a protected class; 2) [s]he was qualified for the job and performed it satisfactorily; 3) despite h[er] qualifications and performance, [s]he suffered an adverse employment action; and 4) [s]]he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of h[er] protected class.

746 F.3d at 727 (footnote and citations omitted).[1]

---

[1] When reviewing claims under the Elliott-Larsen Civil Rights Act, Michigan state courts have adapted the *McDonnell Douglas prima facie* framework so as to give "due deference to the unique facts of the individual case." *Lytle v. Malady*, 579 N.W.2d 906, 914 n.19 (Mich. 1998). In doing so, Michigan courts have identified the same first three elements of a *prima facie* case as are set forth in Title VII litigation. The fourth element, however, is defined more broadly by Michigan courts to require simply a showing that the plaintiff "was discharged under circumstances that give rise to an inference of unlawful discrimination." *Id.* at 914.

However, in addressing the plaintiff's race-discrimination claims, the district court here failed to set forth the proper *prima facie*-case standard. Instead of noting that the fourth prong of a *prima facie* case may be established *either* by showing that the plaintiff was treated less favorably than a similarly situated individual outside the protected class *or* by showing that the plaintiff was replaced by a person outside the relevant class, the district court confined its analysis only to the former of the two alternatives. In doing so, the district court correctly concluded that Jackson had failed to identify a similarly situated individual who was treated more favorably than she was. Given that failure of proof, the district court jumped immediately to the conclusion that Jackson could not establish the requisite *prima facie* case. As Trinity appropriately concedes, however, Jackson did offer proof that she, an African-American, was replaced as director of radiology by Donna Moir, a Caucasian. Consequently, Jackson met her less-than-onerous burden of establishing a *prima facie* case of race discrimination, requiring the district court to proceed to the next steps of the *McDonnell Douglas-Burdine* analysis.

Once Jackson established her *prima* facie case of race discrimination, the burden of production shifted to Trinity to articulate a legitimate, nondiscriminatory reason for its employment action. Trinity easily satisfied that requirement by explaining that Jackson's employment with the hospital was terminated because of her inability to resolve conflicts among staff members, because of her poor performance in mentoring managers, because of complaints from physicians generated by inattention to their needs, because of her lack of responsiveness to coaching suggestions, and because of her dictatorial, top-down style of management.

The burden of production thus once more shifted to Jackson, this time to establish that the reasons offered by Trinity for the termination were mere pretexts for prohibited racial discrimination. A plaintiff may demonstrate the pretext necessary to defeat a motion for

summary judgment "by showing that the proffered reason [for the adverse employment action] (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Wexler*, 317 F.3d at 576 (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). Similarly, the Michigan courts, resolving claims brought under the Elliott-Larsen Civil Rights Act, have held that, "[t]o prevail, the employee must submit admissible evidence to prove that the employer's nondiscriminatory reason was not the true reason for the discharge and that [prohibited discrimination] was a motivating factor in the employer's decision." *Town v. Mich. Bell Tel. Co.*, 568 N.W.2d 64, 68 (Mich. 1997). *See also Lytle*, 579 N.W.2d at 916 ("a plaintiff must prove discrimination with admissible evidence, either direct or circumstantial, sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff").

Rather than pigeon-hole her pretext arguments into one of the three categories set forth in *Wexler* and other decisions, Jackson submits "that the very reasons Defendant gave for her discharge are evidence of discrimination against Plaintiff based on race." However, an examination of Jackson's arguments in this regard reveals that Trinity's termination decision was not motivated by invidious discrimination.

Jackson argues first that a racially discriminatory intent on the part of Trinity management can be inferred from the fact that Jackson's superiors routinely attributed problems in the radiology department to Jackson's "leadership style" but never held Erika Page responsible for the friction between the parties. However, Jackson did not, and could not, dispute that both her subordinates and her superiors found her management style to be troublesome. In fact, during her deposition, Jackson agreed that she "ha[d] a direct style and a

18

strong presence," that some employees were intimidated by her because "[m]ost employees are intimidated by their boss," and that Striebich discussed with her the need to modify her approach with some employees "to get better performance and response from them." Nor does Jackson disagree that Striebich, Murphy, and McNeil tried at various times to "coach" her on how to handle situations and disagreements with her managers with less friction and more aplomb. Yet with the surplus-computer issue, with the payroll-records issue, and with the anger expressed by Ealy over Page's oversight of her department while Ealy was on medical leave, Jackson employed tactics that exacerbated hard feelings rather than dealing with the concerns in a calmer, less-confrontational manner.

Jackson's assertion that only she, and not Page, was disciplined as a result of the friction between the two women also is not supported by the record on appeal. Indeed, the uncontroverted evidence indicates that McNeil received complaints about Page on "[m]ore than one occasion," and that "at various times, Erika was counseled about eye rolling, body language, and told that that was part of the problem with the results she received when interacting with people." In fact, at the time Page left Trinity in January 2011, "she was suspended pending an investigation at which [hospital management was] looking at potential termination."

Nor is there any merit to Jackson's argument that Trinity's discriminatory intent was evidenced by the fact that Striebich, a Caucasian, gave Jackson an evaluation less glowing than an evaluation authored by Jackson's former supervisor, Denise Brooks-Williams, an African-American, or by the fact that the listed bases for the termination decision relied upon subjective critiques of Jackson's leadership style. First, Brooks-Williams's initial evaluation did not contain the unqualified praise that Jackson would have us believe. According to Brooks-Williams, she too counseled Jackson on strategies for managing the "communication conflicts"

19

between the director and Page. Moreover, any positive comments in Brooks-Williams's first full evaluation of Jackson were made recognizing that Jackson's noted strengths in interpersonal relationships were viewed relative to those of her predecessor in the position. Even so, the 77.7 evaluation score given in Brooks-Williams's supposedly glowing review would, according to Brooks-Williams, correlate to a present-day rating of only 2.8-3.0 out of a possible 4.0 points. Second, Brooks-Williams was contacted by Striebich prior to Striebich finalizing Jackson's July 2008–June 2009 evaluation, an evaluation that resulted in a strikingly similar score of 2.88 points.

Furthermore, the fact that subjective criteria such as Jackson's "leadership style" were considered by Trinity does not mean that the termination decision was the result of invidious discrimination. As we observed almost 30 years ago:

> It may be worthwhile to note here that Title VII does not diminish lawful traditional management prerogatives in choosing among qualified candidates. So long as its reasons are not discriminatory, an employer is free to choose among qualified candidates. An employer has even greater flexibility in choosing a management-level employee, as is the case here, because of the nature of such a position.

*Wrenn*, 808 F.2d at 502 (citations omitted). Nothing in the record before us supports the contention that invidious racial discrimination entered into the decision to terminate Jackson's employment with Trinity. Instead, the evidence points to the fact that Jackson was fired because of her own inability to temper her confrontational management style and due to the loss of confidence in and respect for the work of the radiology department.

Indeed, the record evidence indicates that, contrary to Jackson's assertions, Trinity had a favorable record of recruiting and retaining African-Americans in leadership positions. Jackson herself could name only two African-American employees, other than herself, whose employment at the hospital had been terminated. However, one of those individuals was an

employee of a company contracted to provide environmental services, and Trinity had no role in that person's termination. Furthermore, although the second individual was employed directly by Trinity, Jackson admitted that she did not know "whether there was cause or not" for that termination or "what her behaviors or performance was."

Even Toni Flowers-Jefferson, the hospital's associate vice-president in charge of diversity and inclusion, whose job required her to be aware of all changes in the composition of the hospital's leadership structure, could remember only two instances in which an African-American individual in a leadership position was replaced by a Caucasian employee. One such change occurred when Brooks-Williams was promoted to a position as chief executive officer of another Trinity hospital and was replaced by Striebich. The other instance involved Jackson's own termination and the hiring of a Caucasian woman to assume Jackson's position.

Neither the objective facts surrounding Trinity's employment decisions nor Jackson's vague claims of disrespect raise a genuine dispute regarding whether the articulated justification for Jackson's termination was a pretext for forbidden racial discrimination. Thus, the district court properly granted summary judgment to Trinity on Jackson's racial-discrimination causes of action.

## CONCLUSION

The district court erroneously determined that Jackson failed to establish a *prima facie* case of discrimination, despite the fact that Jackson did satisfy her less-than-onerous *prima facie* burden by showing that she was replaced as director of radiology by an individual outside her protected class. Thus, the district court should have proceeded to a consideration of the subsequent steps of the *McDonnell Douglas-Burdine* burden-shifting analysis. In any event, Jackson did set forth arguments that addressed the remaining steps of that decisional paradigm,

21

even though she failed to identify any genuine dispute of material fact that would justify placing her complaint before a jury. We therefore AFFIRM the judgment of the district court in its entirety.